**Clyde HARVEY, Appellant,**

v.

**STATE OF MISSISSIPPI, Appellee.**

No. 22005.

United States Court of Appeals
Fifth Circuit.
Jan. 12, 1965.

Anthony G. Amsterdam, Philadelphia, Pa., R. Jess Brown, Jackson, Miss., Jack Greenberg, New York City, for appellant.

Harold W. Davidson, James E. Smith, Carthage, Miss., for appellee.

Before TUTTLE, Chief Judge, JONES and ANDERSON,* Circuit Judges.

TUTTLE, Chief Judge:

On July 10, 1964, Clyde Harvey, a Negro farmer living nine or ten miles from Corinth, Mississippi, was stopped on the way home from town and arrested without a warrant, taken to jail and charged with "possession of whiskey." This is a misdemeanor under the Mississippi Statute punishable by a fine of up to $500 and up to 90 days in jail.[1]

On July 13, Harvey went to the home of the Justice of the Peace. In the language of the Justice the following is what happened:

"I went out in front of my house in the yard. He drove the pick-up, pulled up at my driveway, and I went out on the porch and turned the light on. It was getting pretty dark. I saw it was him and I went on out there and he told me he had come down there to enter a plea of guilty. He said he knew that was his whiskey and said he just wanted to enter a plea of guilty to it.

"Q. Did you accept the plea?

"A. Yes, sir.

"Q. Did he ask you about what the sentence would be?

"A. Yes. He wanted to know how much the fine would be. I told him I would like to investigate the thing. I at first asked him, 'Clyde, are you selling whiskey?' He said, 'No,' I told him that I wanted to investigate the case further and said, 'If you are a bootlegger, I am hard [sic] on a man that sells whiskey that I am a man that just drinks it.' And I told him I would let him know the regular court day what his fine would be. And he left and that's the last time I saw Clyde Harvey."

The regular court day, to which the case was returnable was July 23rd at Walnut Grove.

---

* Of the Second Circuit, sitting by designation.

1. For the purpose of this record the following testimony by Harvey is undisputed as to the occasion of the arrest:

"Q. I will ask you on or about the tenth day of July approximately the hour of two or two-thirty P. M., the time you stated you were taken into custody, state to the Court in your own words the circumstances under which you were taken into custody and by whom.

"A. I can't state the law's name, but I know the jailor since I've been in jail. Mr. Robinson is one. The other two I can't think of.

"Q. As far as where you were arrested just give us a sequence of what happened.

"A. Me and my wife had left home that morning and went over to town and made groceries and on the way back home stopped me on the road and asked me did I live in that big white house over there and I told them I did. Said, 'Well, we been over there and found two cans of beer and a little whiskey.'

"Q. A little whiskey?

"A. A little whiskey in a jar. That's what he said. So he said, 'Well, consider yourself under arrest and come on and go with us.' I said, 'OK.'

"Q. At this time did he show you a warrant?

"A. No, sir.

"Q. Did you see him with one?

"A. No, sir. He said he left it at my house. I haven't seen it yet. (His wife later testified that she found a search warrant at the house)

* * * * * *

"A. So I got out of my truck and got in the car with them and they carried me on to jail. I wasn't in there over thirty minutes or an hour before my wife and a friend of mine come bonded me out. I asked the Sheriff, 'What is my fine?' He told me when court was. I said, 'What is my fine; I don't want to go to no court.' And he said the Judge would tell me, Mr. Adams. I said, 'Well, OK.' So I just signed my bond and we went on out and went home."

On the night before the day fixed for court, Justice of the Peace Adams stated that a lawyer called him from Jackson, Mississippi, stating that he was calling in behalf of Clyde Harvey who wanted to know "what we had done." He said that he told the lawyer that Harvey had already pleaded guilty to the charge and he told him he would let them know what the sentence was on the regular court day, "that I wanted to investigate it." The next day two lawyers came to court stating that they were there "in behalf of Clyde Harvey." The testimony then goes on: "I told them again he had already pleaded guilty to the charge and all I lacked was sentencing. And they wanted to know what the fine was going to be and I told them to contact me that night and I would tell them. So one of them called me from Jackson and wanted to know had I decided. I told them I had and I told them what the fine would be then."

The appellant testified that he did not have any lawyer representing him either before or after the July 23rd court day. While it would be difficult to credit this statement by Harvey under ordinary circumstances, in view of the apparent knowledge the lawyers had about his case and their expressed interest in it, it is not at all difficult to understand it and credit it in light of other facts testified to without dispute at the hearing in the trial court. We refer to the activities engaged in by residents of other states in the State of Mississippi, including the vicinity of Corinth, at the time of the occurrences that have been related

above. These persons, generically known as "Civil Rights Workers" were engaged in conducting what they call "freedom schools" to assist in registering Negro applicants to vote in the State of Mississippi, and several of them were staying at the residence of Mr. and Mrs. Harvey. The activities of nonresident counsel in assisting in these efforts were generally known to the trial court and is now generally known to us as well. A motion to remove the Harvey case to the federal court under Civil Rights Removal Statute, Title 28 U.S.C.A. § 1443, makes clear the interest which these civil rights workers had in the Harvey arrest, since in the removal petition it was alleged that the arrest and prosecution here complained of were outgrowths of the Harveys' permitting the civil rights workers to stay in their home. It can thus readily be understood that the out-of-state lawyers may have sought information about the Harvey case as a part of their overall interest in vindicating what they considered to be the rights of the workers to be free from local harrassment, without their having a primary responsibility to represent Clyde Harvey as an accused person. In any event, there was no proof that they were either engaged in, or directly concerned with, representing Clyde Harvey. He testified that he did not engage them. Their activities, as represented by the testimony, were to obtain information.[2]

Although the Justice of the Peace and Harvey had both spoken in terms of "a fine" as punishment for the offense for which he was charged,[3] the sentence

2. Their presence in the justice court on the day set for trial was even subject to challenge. They were not members of the Mississippi bar. They approached the County Prosecuting Attorney and asked him whether they would be "challenged to practice in the court." Mr. Wright testified as follows: "I told them that it remained to be seen, that I would rather wait and see if the case was called up and if it was they could make their announcement to the court as to the fact they did represent him and we would look into the matter at that time." In response to the question "Was the case

called?" Mr. Wright answered, "No. The judge advised the attorney that he had entered a plea of guilty * * *." He said they then arranged to phone that night to ascertain what the sentence was.

3. For example, Justice of the Peace Adams said of the two lawyers, "All they were interested in was wanting to know how much the fine was. They didn't offer no excuse for Clyde or anything; they just acted like they knew all about the case. There wasn't anything said about a trial or anything. I told them on the phone he had pleaded guilty

entered on the records of the Justice of the Peace was a $500 fine and a 90-day jail term. Although this entry was made on July 23rd, the mittimus or order for arrest was not issued until September 4, 1964, and Clyde Harvey was picked up and put in jail on September 9th. Harvey had no actual knowledge that he had been sentenced to a jail term until the mittimus was served on him and he was put in jail. By that time the 40-day statutory period for the taking of an appeal from a Justice Court to the Circuit Court had expired. Thus, with no appeal available appellant could not be released on bond, and he commenced serving his 90-day sentence.

Thereupon, present counsel got active on behalf of appellant and, asserting discriminatory attitudes prevalent in Leake County, Mississippi, and his apprehension that he could not receive a fair and impartial trial in that County, and also alleging the invalidity of the previous proceeding before the Justice of the Peace, counsel sought to remove the prosecution to the Federal District Court for the Southern District of Mississippi. The removal petition also included a prayer for a writ of habeas corpus. In support of this prayer, it was alleged that appellant had sought to have the plea of guilty set aside by the Mississippi Supreme Court by filing a petition for writ of error corum nobis which had not then been acted upon.[4]

The United States District Court set the matter down for hearing and treated the response filed by the State as a petition for remand to the state court. In view of the record entry showing that a plea of guilty had been entered by the appellant in the Justice of the Peace Court, the District Court concluded that it had no power to retain jurisdiction under 28 U.S.C.A. § 1443 because the petition for removal had not been filed "before trial" as required by Section 1446. The court therefore entered an order remanding the case to the Justice of the Peace for Leake County, Mississippi.

In dealing with the petition for writ of habeas corpus, the trial court stated:

"The petitioner prays for a writ of habeas corpus, and I treated this as a petition, also, for writ of habeas corpus and I did have him brought over for the hearing today and he has testified. And I considered the testimony on the motion to remand. I cannot grant the petition for the writ of habeas corpus. It must be denied because he has not exhausted his state remedies. As to the exhaustion, I cite In Re [Wyckoff] Wycoff, 159 [196] Fed.Supp. 515." And also, "I deny the petition of the writ of habeas corpus because he has not exhausted his state remedies as required to do by Federal Statute."

The appellant filed a Notice of Appeal to this Court both from the order of remand and from the denial of the writ of habeas corpus. In connection with the filing of the notice, appellant also filed a petition for a stay of the order of remand and requested that he be enlarged on bail pending appeal in the habeas corpus case. The motion for stay was initially heard by another panel of this Court but, on account of the absence of the transcript of proceedings before the district court, that panel of the Court reset the case before us for determination on the merits, carrying the motion for stay with the case. After studying the transcript and hearing oral argument, we entered an order enlarging the appellant on his execution of a $500 bond signed by himself pending our determination of the case on appeal. He

and what they had come up there for I guessed was to find out how much the fine was going to be."

4. Prior to the hearing before the District Court, the Supreme Court of the State of Mississippi denied the petition for writ of error corum nobis, stating in effect that such writ issues under the Mississippi laws only where the Supreme Court has affirmed the conviction appealed from, citing Petition of Elsie Lee Broom, 168 So.2d 44, decided October 12, 1964.

has made this bond and has now been released pending final determination of the case.

In the present posture of the case we need not determine whether the trial court erred in remanding the case to the state court. The disposition we make of the case moots that question. We proceed at once to the habeas corpus appeal. If Harvey can show an unconstitutional deprivation of his liberty by reason of basic defects in the state court proceedings, and if he has exhausted his state remedies, the petition for habeas corpus is the proper means to test the validity of the state court judgment.

In order to test jurisdiction of the federal courts, we turn first to the question of exhaustion of state remedies. In considering such remedies, we look of course to the state of the matter at the time the federal habeas corpus petition was filed. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837.[5]

What remedies, then, were open to Harvey after he learned, several days after the time for appealing his judgment of conviction had expired, that he stood convicted and sentenced to pay a $500 fine and serve 90 days in jail if he desired to raise constitutional questions attacking the trial and sentence? The appellee here points to the Mississippi Statute providing for the writ of habeas corpus. Section 2815 of the Mississippi Code of 1942 as amended, states:

"The writ of habeas corpus shall extend to all cases of illegal confinement or detention by which any person is deprived of his liberty, or by which the rightful custody of any person is withheld from the person entitled thereto, except in the cases expressly excepted."

Appellee's brief does not call our attention to Section 2816, which contains the exceptions referred to in Section 2815. So far as applicable here, Section 2816 provides: "Nothing in this chapter shall authorize the discharge * * * of any person suffering imprisonment under lawful judgment."

It is clear from a study of the Mississippi decisions that this provision has strictly limited the class of cases as to which Mississippi courts permit the use of the writ. In Ex parte Chain, 210 Miss. 415, 49 So.2d 722, the court said, "It is also well settled in Mississippi and elsewhere that the writ of habeas corpus cannot be made to perform the functions of a writ of error or an appeal, and that a person in custody under a judgment or order of a court of competent jurisdiction cannot obtain his discharge on habeas corpus on account of errors or irregularities, however gross, in the judgment or in the proceedings on which the judgment was founded. State v. Boyd, 110 Miss. 565, 70 So. 692; Ex parte Golding, 148 Miss. 233, 114 So. 385; Kelly, Sheriff v. Douglas, 164 Miss. 153, 144 So. 237; McLemore v. Love, 197 Miss. 273, 19 So.2d 828." In the case of State v. Boyd, supra, the Supreme Court said, "Therefore the court erred in admitting, in the habeas corpus hearing, any evidence attacking collaterally the validity of the judgment under which the appellee was then in custody."

It seems clear, therefore, that only such defects as may appear on the face of the judgment may be made the basis of an attack by habeas corpus under the Mississippi jurisprudence. If, as the Supreme Court of Mississippi said in the Boyd case, "the judgment of the lower court appears from this record to be regular and lawful in all respects, it was not permissible at the hearing of the writ of habeas corpus to inquire into any alleged errors or irregularities in the proceedings behind the judgment." The

5. The Supreme Court in Fay v. Noia made it abundantly clear that a failure of a state criminal defendant to appeal from his original conviction was not a bar under Section 2254 of 28 U.S.C.A. to an application for habeas corpus in the federal court. The court said on page 435, on page 847 of 83 S.Ct., "We hold that § 2254 is limited in its application to failure to exhaust state remedies still open to the habeas applicant at the time he files his application in federal court."

appellant here, having failed to take an appeal from the judgment and sentence under which he stands committed, by reason of the facts and circumstances above related, the habeas corpus court could not, in Mississippi, consider his present complaint attacking the irregularities allegedly amounting to want of due process in the proceedings by which he was convicted and sentenced.

■ It appears that the appellant did attempt twice to proceed by writ of corum nobis which has limited application in the State of Mississippi. He first applied to the Supreme Court of the State for a writ of corum nobis, but this petition was denied on the ground as stated by the court "since this court has not affirmed the conviction, the motion does not lie under Section 1992.5." Subsequently, appellant sought to recommence proceedings by corum nobis by presenting his motion to Justice of the Peace Adams.[6] The latter refused to permit a discussion of the matter and caused the person representing Harvey to remove the motion papers from his presence.[7] Whatever benefit might have accrued to appellant from filing the petition and subsequently appealing from a denial of relief by Justice of the Peace Adams, he could obviously not obtain any relief in that quarter in this case since no record could be predicated upon the actions actually taken by the Justice of the Peace in walling himself off from consideration of the motion.

■ We conclude that at the time of the hearing before us, if not actually at the time of the filing of the petition in the trial court, either by relation back or because no valid attack could then be made by proceeding by the route of corum nobis in the state court, the appellant's state remedies were exhausted. Moreover, having already served some 45 days of his term before the trial court hearing and some 62 days of his term of 90 days before the hearing in this Court, we consider that in order to prevent the judgment and sentence from becoming moot, the federal court has the power to take jurisdiction in the circumstances in this case. It must be remembered that an exception exists in § 2254 when circumstances exist "rendering [State corrective] process ineffective to protect the rights of the prisoner."

■ We come now to the merits of the habeas corpus proceedings. The appellant contends that the fact that Harvey was convicted on the basis of a guilty plea entered without the assistance of counsel and without being advised of his right to the assistance of counsel constitutes a denial of due process under principles established in Johnson v. Zerbst, 1937, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357. That the right to the assistance of coun-

6. This proceeding commenced following the hearing on the petition for habeas corpus in the district court but, in view of the power of a single judge of this court to pass on a petition for a writ of habeas corpus, counsel for respondent at oral argument conceded that this occurrence could be viewed as though it had actually occurred at the time the district court passed on these matters.

7. Counsel for appellee conceded the correctness of the statement made by George Bradley touching on this matter:

"On November 4, 1964 at about 6:30 P.M., I went to the home of Justice of the Peace Jack Adams, in the City of Carthage, Leake County, to file with him a Petition for Writ of Error Coram Nobis, a Motion to Set Bail and to re- quest him to sign an order either setting or denying bail for Clyde Harvey.

"I gave the papers to Jack Adams who looked at them and said, 'What are these for?' I started to explain them, when he told me to take them and leave. He said, 'I'm all through with Clyde Harvey'. I walked outside leaving the papers on a chair where he had placed them.

"Mr. Adams followed me outside, saying, 'Get off my land and con't [sic] come back'. He pushed the papers into a small open window in the car and slammed the car door as I was entering the car. When I began to pick up the papers from the car floow [sic] he said, 'If you throw those on the ground I'll prosecute you.' I left.

"All of this was done in a threatening manner."

sel when entering a plea applies in state as well as federal tribunals is firmly established. Hamilton v. State of Alabama, 1961, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114; White v. State of Maryland, 1963, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193. In White, the Supreme Court disposed of the argument that Maryland's "preliminary hearing" was not a "critical" stage of the proceedings by saying: "[w]hatever may be the normal function of the 'preliminary hearing' under Maryland law, it was in this case as 'critical' a stage as arraignment under Alabama law [dealt with in Hamilton v. Alabama, supra], for petitioner entered a plea before the magistrate and that plea was taken at a time when he had no counsel."

■ Waiver of such right to counsel cannot be presumed from the mere fact that the accused appeared without counsel or failed to request counsel. Carnley v. Cochran, 1962, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70; Doughty v. Maxwell, 1964, 376 U.S. 202, 84 S.Ct. 702, 11 L. Ed.2d 650. And the Second Circuit Court of Appeals, sitting en banc, recently held that "the failure to advise a defendant of his right to counsel will invalidate a plea of guilty even in the absence of a showing of prejudice" in both state and federal cases. United States ex rel. Durocher v. LaVallee, 2 Cir. 1964, 330 F.2d 303, 308, cert. denied, 377 U.S. 998, 84 S.Ct. 1921, 12 L.Ed.2d 1048.

■ It is true that the cases which support appellant's argument all involved felony convictions, but their rationale does not seem to depend on the often purely formal distinction between felonies and misdemeanors. One accused of crime has the right to the assistance of counsel before entering a plea because of the disadvantageous position of an unassisted layman in a court of law and because of the serious consequences

which may attend a guilty plea. Such disadvantages and consequences may weigh as heavily on an accused misdemeanant as on an accused felon. The record reveals that the guilty plea entered in the case at bar had grievous consequences indeed.

It is undisputed that Harvey was unable to read or write, except to write his own name. He had not attended a single day of school. Yet his plea of guilty, which was the sole basis of his conviction and the keystone of the entire case against him, was accepted in highly informal and rather confusing circumstances. In the first place, there was confusion as to the nature of the offense charged. When subsequently asked if he intended to plead guilty to a charge of possessing whiskey, Harvey testified that he intended to plead guilty to possessing beer, that he knew nothing about whiskey.[8] That this confusion had serious results is shown by the testimony of Judge Adams that his decision to impose the maximum penalty was based on his "finding" that Harvey was a bootlegger. This finding must have been bottomed to some extent upon the view that Harvey's guilty plea comprehended possession of whiskey as well as beer.

More important, perhaps, was the confusion over the penal consequences of a guilty plea. Judge Adams' version of what transpired when he accepted Harvey's plea unequivocally sets forth that both he and the appellant were discussing "how much the *fine* would be." He said he accepted the plea standing in his front yard and said that then "I told him I would let him know the regular court day what his *fine* would be." According to Judge Adams' testimony, thereafter, the night before the trial date, a lawyer called him from Jackson, Mississippi. This is how he related it:

8. On cross examination, the following answer was given:
"Q. Now, do I understand from the substance of your testimony that it was your intention to plead guilty to the charge in this case?

"A. What you mean?
"Q. Possession of whiskey?
"A. Well, not whiskey, but beer. Because I don't know anything about whiskey."

(The italicizing in these quotations are added)

"The night before the 23rd day of July there was a lawyer called me from Jackson. I don't recall him name. He told me his name, I believe—maybe he didn't. But he said he was calling me in behalf of Clyde Harvey and wanted to know did I have a Clyde Harvey charged with possession of whiskey in my court. I told him I did and he wanted to know what we had done. I told him that Clyde had already pleaded guilty to the charge and he asked me, 'What's the sentence?' I told him 'Well, I told Clyde I would let him know on the regular court day; that I wanted to investigate it.' I don't believe he said whether he was coming up there or not, but they did come to court the next day. There was two of them, and I don't remember their names, but they told me up there at court that they were there in behalf of Clyde Harvey and I told them again he had already pleaded guilty to the charge and all I lacked was sentencing. And they wanted to know what the *fine* was going to be and I told them to contact me that night and I would tell them. So one of them called me from Jackson and wanted to know had I decided. I told them I had and I told them what the *fine* would be then."

In other testimony, Judge Adams made it even plainer that he was speaking of a *fine* as the sentence. Speaking of the telephone call, he said, "I told him, 'Clyde has already pleaded guilty to it,' and he said, 'Well, how much is the *fine*,' I told him, 'I haven't fully decided *how much* I am going to put on Clyde; if he is a bootlegger I will put more naturally; if he is just a fellow who just drinks I don't believe *much fine* ought to be put on him, on a fellow like that.'" Then, further, speaking of the appearance of the two lawyers in court, the Justice of the Peace said, "All they were interested in was wanting to know how much the *fine* was. They didn't offer no excuse for Clyde or anything; they just acted like they knew all about the case. There wasn't anything said about a trial or anything. I told them on the phone he had pleaded guilty and what they come up there for I guess was to find out how much the *fine* was going to be." He then testified that one of them called him back that evening, and in response to the question, "And you informed them as Clyde Harvey's attorneys what the *fine* would be?" Judge Adams answered, "Yes, sir."

There is nothing in the record to show that Harvey knew that he had received a jail sentence until, possibly fortuitously, the Justice of the Peace issued a mittimus for his arrest more than 40 days after the entry of the sentence, which was too late for him to take an appeal under the state law. He could not, after learning of the mistake he and the Justice of the Peace had indulged in by contemplating a fine only, move to set aside his plea of guilty and submit to a trial either with or without a jury. As stated by the Mississippi Supreme Court in Pittman v. State, 198 Miss. 797, 23 So.2d 685, quoted with approval in Lambert v. State, 245 Miss. 227, 147 So.2d 480, at 483:

> "We think the defendant should be permitted to withdraw his plea of guilty, when unadvisedly given, where any reasonable ground is offered for going to the jury. This is a matter within the discretion of the court, but a judicial discretion, which should always be exercised in favor of innocence and liberty. All courts should so administer the law and construe the rules of practice as to secure a hearing upon the merits, if possible. * * * The law favors a trial upon merits by a jury * * *."

While there is no assurance Harvey would have requested a jury trial, it is plain that rather than suffer the imposition of a 90-day jail sentence and the

payment of a $500 fine, he may well have put on the state the burden to prove its case as to the possession of whiskey, since, as he testified, he had no intention of pleading guilty of that charge.

In Evans v. Rives, 1942, 75 U.S.App. D.C. 242, 126 F.2d 633, a case involving a federal misdemeanor, the Court stated:

"It is * * * suggested * * * that the constitutional guaranty of the right to the assistance of counsel in a criminal case does not apply except in the event of 'serious offenses.' No such differentiation is made in the wording of the guaranty itself, and we are cited to no authority, and know of none, making this distinction. The purpose of the guaranty is to give assurance against deprivation of life or liberty except strictly according to law. The petitioner would be as effectively deprived of his liberty by a sentence to a year in jail for the crime of non-support of a minor child as by a sentence to a year in jail for any other crime, however serious. And so far as the right to the assistance of counsel is concerned, the Constitution draws no distinction between loss of liberty for a short period and such loss for a long one." 126 F.2d at 638.

While the rule as thus stated has never been expressly extended to misdemeanor charges in state tribunals, it has been argued that such a principle is implicit in the Supreme Court's decision in Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733. Be this as it may, the reasoning in Evans along with other recent right-to-counsel decisions persuades us that we should apply that rule in the present case. See Hamilton v. Alabama, supra; White v. State of Maryland, supra. The failure of notice to Harvey of his right to the assistance of counsel invalidated his guilty plea and rendered his conviction and incarceration constitutionally improper. We therefore reverse the judgment of the trial court and remand the case for the entry of judgment ordering the release of the appellant from custody on the present conviction and sentence.

Reversed and remanded.