[No. 39357. En Banc. June 5, 1969.]

LEON MORRIS HENDRIX, Respondent, v. THE CITY OF SEATTLE et al., Appellants.*

*Reported in 456 P.2d 696.

A. L. Newbould, Denny E. Anderson, H. Joseph Coleman, and M. Wayne Blair, for appellants.

John M. Junker and Michael H. Rosen, for respondent.

Vernon J. Guinn, amicus curiae.

HALE, J.—There is an old saying that hard cases make bad law and this case seems to vindicate it. The case invites an extreme ruling because it involves an unusually severe sentence in Seattle Municipal Court passed upon an 18-year-old indigent defendant[1] who had no attorney and no funds with which to employ one. The primary question is whether a defendant in municipal court charged with a serious misdemeanor has a constitutional right to counsel at public expense. A secondary question, but one of nearly equal gravity, is whether a municipal court judge has inherent judicial authority either to compel members of the bar to serve indigent defendants in municipal court without compensation, or, in the alternative, to bind the municipal treasury to pay for such services.

The defendant was charged in two complaints with two distinct violations of the disorderly conduct ordinances of Seattle. In one complaint, the city charged him with the misdemeanor of stealing money from the Milk Barn Car Wash, in violation of ordinance No. 16046, codified as Seattle code, § 12.11.020; the other complaint, brought under the same disorderly conduct ordinance, accused him of contrib-

---

[1] Respondent here was the defendant in municipal court. For purposes of this opinion, he retains the title of defendant.

uting to the delinquency of a 13-year-old girl by accompanying, congregating or loitering with her at 3 o'clock in the morning about the public streets.[2]

On arraignment before the municipal court on both charges, the court advised the defendant of his right to counsel and offered him time and opportunity to obtain counsel. Defendant advised the court that he had no funds with which to employ an attorney and requested the court to provide him counsel without cost. In denying this application, the court advised the defendant that the municipal court had neither the authority to compel attorneys to serve without compensation nor funds with which to pay attorneys in defending indigent defendants in municipal court. In this connection, it should be noted that we have not been advised that the city of Seattle or any other city of this state has appropriated funds or legislatively authorized the expenditure of public funds for the compensation of counsel for indigent defendants in municipal court.

The case proceeded to trial and, on conviction, defendant was sentenced by the municipal court to serve 180 days consecutively on each charge, making a total sentence of 360 days. He timely filed notice of appeal—so far as the record appears—and separately petitioned the superior court for writ of certiorari to review the municipal court's refusal to supply him with counsel. The superior court on review sustained defendant's contentions that he had a constitutional right to appointment of counsel without cost; held that the municipal court had abridged that right; and, setting aside the two convictions, remanded the cause to the municipal court with directions to supply counsel to the defendant at public expense. Defendant, thus, at the outset, had simultaneously pending in the superior court his petition for review and his appeals. Before the hearing of his

---

[2] ". . . not being the parent or guardian of . . . , a minor child, age 13 years, [defendant] did willfully and unlawfully . . . accompany, congregate or loiter with such minor at Rainier Avenue South and South Genesee Street, a public place, after the hour of 10:00 o'clock P.M., to wit, 3:00 A.M. without the express consent of said minor's parent or guardian, . . . ."

superior court review, however, defendant moved for and the court granted him a dismissal of his appeals. The superior court then, on certiorari, remanded each cause to the municipal court. It was the city's contention then and now that certiorari did not lie to review the municipal court convictions inasmuch as the defendant had filed his appeals and thus had a plain, speedy and adequate remedy at law.

Defendant urged and the trial court ruled that one accused of a serious misdemeanor in Seattle Municipal Court has a constitutional right to the appointment of counsel for his defense under the sixth amendment to the constitution of the United States,[3] article 1, section 22, constitution of the state of Washington,[4] and the fourteenth amendment to the constitution of the United States. Further, he contends that he should be supplied counsel as a matter of judicial policy.

■ Our approach to the constitutional aspects of the case must be guided by those concepts of judicial restraint which have in such large measure shaped the constitutional history of this country and laid the foundation for separating the powers of government into the legislative, executive and judicial functions, a doctrine upon which individual freedom seems so largely to depend. In keeping with this doctrine, courts ought not abrogate or compel legislative action either directly or indirectly unless the constitutions require it. Where reasonable doubts exist as to a constitutional duty or prohibition affecting the legislative

---

[3]"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense." U.S. Const., amend. 6.

[4]Const. Art. 1, § 22 (amendment 10), provides, inter alia:

"In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel, . . . to have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed and the right to appeal in all cases . . . ."

branch of government, they should be resolved in favor of the legislature's action or inaction.

▮▮▮▮ Since the adoption of the Sixth Amendment, the Supreme Court of the United States has not, despite countless opportunities to do so, declared that one accused of a misdemeanor has a constitutional right to appointed counsel. *See* Junker, *The Right to Counsel in Misdemeanor Cases,* 43 Wash. L. Rev. 685 (1968).[5] The traditional line drawn between felonies and lesser crimes has persisted from our colonial beginnings to the present time, and no authoritative decisions to the contrary have been presented to us which eradicate that distinction. In a nearly unbroken line, the leading cases involving the right to counsel at public expense and the corresponding obligation to furnish counsel depend upon the marked distinction between felonies and lesser offenses.

For example, *Gideon v. Wainright,* 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792, 93 A.L.R.2d 733 (1963), cited by the defendant, involved the felony of burglary. That case simply declared a constitutional rule for all courts—a rule never doubted in the state of Washington since earliest territorial days—that on an arraignment for the felony of burglary the court, on request, was under a constitutional duty to appoint counsel for an indigent defendant, and failure to supply counsel on request deprived the court of jurisdiction.

On this very point, the Supreme Court has recently twice declined to review a refusal to appoint counsel in state court misdemeanor prosecutions. Although a denial of certiorari by the Supreme Court has not been deemed to amount to a declaration, modification or repudiation of a rule, it is not totally without significance especially where dissenting opinions highlight the refusal. We thus should not ignore the juridical circumstances that, not long after the *Gideon* decision, the Supreme Court in two cases where

[5]Professor Junker opens his comprehensive treatise with the statement: "The indigent misdemeanant's right to appointed counsel has yet to receive explicit constitutional recognition by the United States Supreme Court."

state courts had expressly refused to appoint counsel at public expense in misdemeanor prosecutions, despite vigorous dissents, denied certiorari to review the very point at issue before us. *Winters v. Beck,* 239 Ark. 1151, 397 S.W.2d 364 (1966), *cert. denied,* 385 U.S. 907, 17 L. Ed. 2d 137, 87 S. Ct. 207 (1966); *State v. DeJoseph,* 3 Conn. Cir. 624, 222 A.2d 752 (1966), *cert. denied,* 385 U.S. 982, 17 L. Ed. 2d 443, 87 S. Ct. 526 (1966).

In *Winters,* the defendant was charged with *immoral conduct, a misdemeanor under a city ordinance;* in *DeJoseph,* the defendant was doubly charged with the misdemeanor of obtaining money under false pretenses and falsely holding himself out to be an attorney. In each case, the trial courts declined to furnish counsel at public expense and the state supreme courts affirmed. Denial of certiorari in those two cases following hard upon *Gideon* afforded us a logical basis on which to analyze the question as to the constitutional right to appointed counsel in misdemeanor cases. Those cases put the question squarely, and in denying certiorari the Supreme Court resolved some of the ambiguity said to reside in *Gideon,* and we think portended the later statement in *Mempa v. Rhay,* 389 U.S. 128, 19 L. Ed. 2d 336, 88 S. Ct. 254 (1967), that *Gideon v. Wainwright* held "that there was an absolute right to appointment of counsel in *felony* cases." (Italics ours.) The term "felony," we think was neither inadvertent nor obiter dictum.

That the Supreme Court has discovered no constitutional mandate compelling the public to supply counsel free of charge in misdemeanor prosecutions may be seen in other cases involving the right to counsel. Whenever failure to supply counsel has been held to be jurisdictional, it is made clear that the charge amounted to a felony. *Johnson v. Zerbst,* 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019 (1938), involved uttering counterfeit money, a felony. *Uveges v. Pennsylvania,* 335 U.S. 437, 93 L. Ed. 127, 69 S. Ct. 184 (1948), held that it was improper for the trial court to accept from a 17-year-old boy pleas of guilty to four separate counts of burglary without first offering to provide the youthful defendant with counsel at public expense. Burglary was un-

mistakably a felony under Pennsylvania law for the maximum confinement could have been 80 years and petitioner was actually sentenced to not less than 20 nor more than 40 years' imprisonment.

On many other occasions, the Supreme Court has made it clear that the constitutional right to counsel at public expense is limited to felony prosecutions. In *Chewning v. Cunningham*, 368 U.S. 443, 7 L. Ed. 2d 442, 82 S. Ct. 498 (1962), a state case involving habitual criminal charges, the Supreme Court held that the trial court's duty to appoint counsel existed in felonies only, saying, at 447:

> We only conclude that a trial on a charge of being a habitual criminal is such a serious one (*Chandler v. Fretag*, 348 U.S. 3), the issues presented under Virginia's statute so complex, and the potential prejudice resulting from the absence of counsel so great that the rule we have followed concerning the appointment of counsel in other types of criminal trials is equally applicable here.

(Footnote omitted.)

Again, in two other cases declaring a duty to supply counsel at public expense, that court made it explicitly clear that the crimes involved were felonies. *Carnley v. Cochran*, 369 U.S. 506, 8 L. Ed. 2d 70, 82 S. Ct. 884 (1962); *White v. Maryland*, 373 U.S. 59, 10 L. Ed. 2d 193, 83 S. Ct. 1050 (1963). Extraordinary circumstances, of course, such as youthfulness, mental retardation, illiteracy, and inability to understand English, buttress the right and usually supply a cogent factor in deciding whether there has been a waiver of the right.[6] Nor should we overlook the explicit

---

[6]The requirement to appoint counsel for an indigent defendant leans heavily on the existence of special circumstances which warrant such action by the court:

1. Gravity of the offense, *i.e.*, whether capital or non-capital: *Williams v. Kaiser*, 323 U.S. 471, 89 L. Ed. 398, 65 S. Ct. 363 (1945); *Tomkins v. Missouri*, 323 U.S. 485, 89 L. Ed. 407, 65 S. Ct. 370 (1945); *Hamilton v. Alabama*, 368 U.S. 52, 7 L. Ed. 2d 114, 82 S. Ct. 157 (1961).

2. Complexity of the charge against the defendant: *Rice v. Olson*, 324 U.S. 786, 89 L. Ed. 1367, 65 S. Ct. 989 (1945); *De Meerleer v. Michigan*, 329 U.S. 663, 91 L. Ed. 584, 67 S. Ct. 596 (1947); *McNeal v. Culver*, 365 U.S. 109, 5 L. Ed. 2d 445, 81 S. Ct. 413 (1961); *Chewning v. Cunningham*, 368 U.S. 443, 7 L. Ed. 2d 442, 82 S. Ct. 498 (1962);

language employed in *In re Gault,* 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967), a juvenile court proceeding subjecting the offender to several years' detention and where, in discussing the right of juveniles in juvenile court to the appointment of counsel, the court said:

> If he had been over 18 and had committed an offense to which such a sentence might apply, he would have been entitled to substantial rights under the Constitution of the United States as well as under Arizona's laws and constitution. . . . He would be entitled to clear advice that he could be represented by counsel, and, *at least if a felony were involved,* the State would be required to provide counsel if his parents were unable to afford it.

(Italics ours.)

Basing the right to counsel squarely upon the proposition that the finding of delinquency in *Gault* amounted to con-

---

*Pennsylvania ex rel. Herman v. Claudy,* 350 U.S. 116, 100 L. Ed. 126, 76 S. Ct. 223 (1956).

3. Ignorance: *Smith v. O'Grady,* 312 U.S. 329, 85 L. Ed. 859, 61 S. Ct. 572 (1941); *Tomkins v. Missouri, supra.*

4. Illiteracy or lack of education: *Carnley v. Cochran,* 369 U.S. 506, 8 L. Ed. 2d 70, 82 S. Ct. 884 (1962); *Cash v. Culver,* 358 U.S. 633, 3 L. Ed. 2d 557, 79 S. Ct. 432 (1959).

5. Extreme youth or lack of experience: *Wade v. Mayo,* 334 U.S. 672, 92 L. Ed. 1647, 68 S. Ct. 1270 (1948); *Uveges v. Pennsylvania,* 335 U.S. 437, 93 L. Ed. 127, 69 S. Ct. 184 (1948); *Moore v. Michigan,* 355 U.S. 155, 2 L. Ed. 2d 167, 78 S. Ct. 191 (1957).

6. Familiarity with court procedure: *Wade v. Mayo, supra; McNeal v. Culver, supra.*

7. Feeblemindedness or insanity: *Palmer v. Ashe,* 342 U.S. 134, 96 L. Ed. 154, 72 S. Ct. 191 (1951); *Massey v. Moore,* 348 U.S. 105, 99 L. Ed. 135, 75 S. Ct. 145 (1954).

8. Inability to understand the English language: *Marino v. Ragen,* 332 U.S. 561, 92 L. Ed. 170, 68 S. Ct. 240 (1947).

9. Prejudicial conduct shown by trial judge, prosecuting attorney or public defender: *White v. Ragen,* 324 U.S. 760, 89 L. Ed. 1348, 65 S. Ct. 978 (1945); *Townsend v. Burke,* 334 U.S. 736, 92 L. Ed. 1690, 68 S. Ct. 1252 (1948); *Hawk v. Olson,* 326 U.S. 271, 90 L. Ed. 61, 66 S. Ct. 116 (1945); *Reynolds v. Cochran,* 365 U.S. 525, 5 L. Ed. 2d 754, 81 S. Ct. 723 (1961); *Gibbs v. Burke,* 337 U.S. 773, 93 L. Ed. 1686, 69 S. Ct. 1247 (1949).

10. Plea of guilty by codefendant within the hearing of the jury: *Hudson v. North Carolina,* 363 U.S. 697, 4 L. Ed. 2d 1500, 80 S. Ct. 1314 (1960).

viction of felony, the court added, at 36, "A proceeding where the issue is whether the child will be found to be 'delinquent' and subjected to the loss of his liberty for years *is comparable in seriousness to a felony prosecution*." (Italics ours.)

Other similar cases make felony the standard: *Powell v. Alabama*, 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55 (1932), involved death sentences for rape. There the Supreme Court reversed state convictions for failure to appoint counsel where the defendants were both illiterate and indigent. *Williams v. Kaiser*, 323 U.S. 471, 89 L. Ed. 398, 65 S. Ct. 363 (1945), and *Tomkins v. Missouri*, 323 U.S. 485, 89 L. Ed. 407, 65 S. Ct. 370 (1945), each involved felonies—robbery with a deadly weapon and murder respectively—both being capital crimes in Missouri. In *Hawk v. Olson*, 326 U.S. 271, 90 L. Ed. 61, 66 S. Ct. 116 (1945), which cited *Williams v. Kaiser, supra,* and *Tomkins v. Missouri, supra,* the charge was murder. *De Meerleer v. Michigan*, 329 U.S. 663, 91 L. Ed. 584, 67 S. Ct. 596 (1947), where a conviction was set aside, a 17-year-old boy was tried for murder without being advised of or allowed his right to counsel. In *Marino v. Ragen*, 332 U.S. 561, 92 L. Ed. 170, 68 S. Ct. 240 (1947), an 18-year-old immigrant, unable to understand English, was allowed by the trial court to waive both a jury and counsel and plead guilty through interpreters. The Supreme Court overturned his conviction, but the case involved the felony of murder.

*Haley v. Ohio*, 332 U.S. 596, 92 L. Ed. 224, 68 S. Ct. 302 (1948), in which the defendant, a 15-year-old boy, stood charged with murder, is similar. *White v. Maryland*, 373 U.S. 59, 10 L. Ed. 2d 193, 83 S. Ct. 1050 (1963), holds that in *capital cases* one is entitled to appointed counsel at a preliminary hearing. Other cases, not essential to this discussion, all involve felonies.

The right to have counsel apparently is not in constitutional law the exact equivalent of the right to free counsel. One can scarcely imagine a situation under our constitutions where an individual does not have the right to employ and consult with an attorney, but this manifest right does

not signify that the people are constitutionally obliged to furnish counsel to him at public expense in the less serious offenses. Perhaps ours would be a better society if the right to have counsel implied a corresponding duty in the state to supply counsel, but the constitutions now in force contain no such apparent mandate and impose the duty on the state only in prosecution for felonies.

Evidently from the beginning of our colonial history, the people of this country have seen a need within the framework of their government for courts of limited jurisdiction designed to handle the lesser offenses speedily, economically and expeditiously, and the constitutions attest that the people have reserved a power unto themselves to constitutionally establish and maintain such courts. At the time of the adoption of our federal constitution, there existed in the country justice of the peace courts (*See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803)), and we see their modern municipal counterparts today carrying on now as before the greater percentage of business that comes into the judicial systems. The constitutions, we think, do not bar the establishment of more elaborate judicial procedures in misdemeanor cases nor prevent the furnishing of counsel at public expense; they simply do not require them. Thus, although the Congress, state legislatures and, perhaps, municipalities possess an undoubted constitutional power to provide counsel at public expense in misdemeanor cases, the question here is *must* they do so or else forfeit the power of the municipal and justice court judiciary to try serious misdemeanors.

The vast volume of judicial business coming annually before the municipal and justice of the peace courts in this country vindicates the wisdom of the constitutions in leaving to the legislative branches of the government the decision as to whether counsel should be supplied at public expense in prosecutions for the lesser offenses. Under the constitutions, that decision devolves upon the branch of government which possesses the power to levy the taxes, allocate the moneys and provide the personnel for carrying it out. If the right to counsel at public expense in municipal

court is a constitutional one, then the court's failure or inability to supply counsel ipso facto deprives the court of jurisdiction and makes it inevitable that prosecution of the offense charged be quashed. *Gideon v. Wainwright, supra.* And, although so dire a consequence provides no basis in law for abridging or disparaging any rights granted in the constitution, it does enjoin upon the courts a duty to circumspectly analyze the matter and ascertain if the right here asserted is granted by the constitutions or is of a lesser status and rests upon public policy or upon neither. Stated otherwise, the extreme consequences affecting the public welfare engendered by providing counsel without cost in misdemeanor prosecutions charges the courts to proceed with great caution before imposing upon the general government unanticipated burdens and duties unless the constitutions may clearly require it.

Up to now, neither the legislature nor the county and municipal governments nor even the Congress has assumed that there exists a constitutional right and a correlative duty to supply free counsel in misdemeanor prosecutions. The judiciary should recognize that other branches of government, as Mr. Justice Holmes observed, "are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." *Missouri, Kan. & Tex. Ry. v. May,* 194 U.S. 267, 270, 48 L. Ed. 971, 24 S. Ct. 638 (1904). Courts must thus operate under a degree of restraint which, while assuring to each person every natural right and every right vouchsafed him by the constitutions, does not enlarge upon those rights in such a way as to disparage the constitutional powers of the legislative and executive branches or abridge their constitutional capabilities.

The sovereign United States and the sovereign state of Washington came into existence with judicial systems designed to administer the criminal law in prosecutions for lesser offenses in a fashion more summary than that reserved for the more serious kinds of crimes punishable by long terms of imprisonment or death. No authoritative precedents have been presented here that the people can no

longer constitutionally maintain courts of this type within the judicial systems; nor do the facts and conditions of modern society appear to reduce the need for courts of summary jurisdiction. Indeed, the need for courts so organized as to be capable of trying the less serious criminal offenses with dispatch seems more imperative today than in our early days.

Professor Junker, 43 Wash. L. Rev. 685 (1968), accepts Silverstein's estimate of 5 million *nontraffic* misdemeanor cases brought annually in the United States. *See* 1 L. Silverstein, *Defenses of the Poor in the Criminal Cases in American State Courts* 123 (1965). The President's Commission on Law Enforcement and Administration of Justice similarly assumes that there are between 4 and 5 million misdemeanors filed in the courts of this country annually —*exclusive of traffic cases.* See the President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: The Courts* 55 (1967). Common knowledge assures us that traffic cases would swell this total by many millions, and if there is a constitutional right to counsel in one kind of serious misdemeanor assuredly there would be the same right in serious traffic misdemeanors. Thus, it is apparent that the need for courts of limited jurisdiction capable of administering justice efficiently and under the pressure of a high volume of judicial business has increased markedly since the adoption of the state and federal constitutions and the Fourteenth Amendment.

We are of the opinion, therefore, that, although everyone accused of crime has a right to counsel, he does not have a constitutional right to counsel at public expense when charged with a misdemeanor in municipal court; and the municipal court is under no constitutional duty to supply counsel at public expense in misdemeanor prosecutions. Whether counsel shall be supplied in such cases is left by the constitutions, we think, to the legislative and not the judicial branches of government.

Next, we consider whether the courts, as a matter of policy in the interests of fundamental fairness and due process of law, should or may declare an inherent judicial

power to furnish counsel at public expense in serious misdemeanors. In considering questions of policy, as distinguished from constitutional principles, the burdens must be weighed along with the possible benefits. Policy considerations from their very nature bring up the relative merits and demerits of the proposal and require a consideration of limitations upon as well as the extent of the power sought to be proclaimed. If a rule is to be declared upon policy considerations alone, it must be reasonably clear that it will do more good than bad.

That the benefits outweigh the detriments in declaring the rights and powers sought here on policy grounds is not clearly discernible. If an inherent duty exists in courts of limited jurisdiction to supply counsel to indigent defendants, these courts necessarily have to be clothed with a power to order attorneys to serve without compensation or a corresponding power to obligate the public treasury to pay for such services. It may well be that society, as a matter of sound public policy, should furnish counsel free of charge to poor persons in serious misdemeanor prosecutions, but is this not a policy that should be declared by the legislative and, perhaps, the executive branches instead of by the courts? Perhaps, in the judgment of the legislative and executive branches, the public welfare may be advanced by providing counsel free of charge in municipal court—or it may be their contrary view that public welfare is better served by preserving the status quo or enacting new and different policies entirely. The legislative and executive branches of government, having available the vast fact gathering and evaluating machinery of government may conclude that the public good will be better served by providing more probation officers, more comprehensive psychiatric-psychological services, better detention facilities and medical care, more and better trained policemen, and that more teachers in smaller classes will do more to improve the condition of our society than furnishing attorneys for defendants in municipal and justice of the peace courts. That is why, unless the right to free counsel in misdemeanor prosecutions is a constitutional right, it seems

a wise policy to leave the decision to those spheres of government which, if deciding affirmatively, have the power to carry out the policy. Recent federal legislation gives us a good example of this.

Not long ago, Congress recognized that there has long existed a legitimate demarcation between the legislative and judicial powers in deciding whether counsel shall be made available without cost to indigent defendants in misdemeanor prosecutions. In 1964, the Congress passed the Criminal Justice Act of 1964, 18 U.S.C. § 3006A, directing the federal district courts to "place in operation" plans for "furnishing representation for defendants charged with felonies or misdemeanors, *other than petty offenses* as defined in section 1 of this title." (Italics ours.) That statute sets up a comprehensive scheme not only to provide counsel for indigent defendants but for investigative services and the assistance of experts if, in the court's judgment, such investigative and expert services are necessary to an adequate defense. The legislation establishes a schedule of fees and authorized the appropriation of public money to pay them. It rests, unavoidably, on the premise that the government has no constitutional duty to supply indigent misdemeanants with counsel at public expense but can, by legislation, assume such a duty and constitutionally provide the funds with which to discharge it, for it arbitrarily provides counsel in offenses punishable by 6 months' or more imprisonment and withholds the privilege in cases of less than 6 months' imprisonment. Altogether the statute demonstrates the superiority of legislative enactment over judicial fiat in effectuating a policy of providing counsel in serious misdemeanor prosecutions because it supplies a means with a method and a power with a duty, and funds with which to carry them out.

■ Congress enacted that statute on the universally accepted constitutional premise that the legislative branch of government has nearly exclusive power to define and classify crimes. *Morgan v. Devine,* 237 U.S. 632, 59 L. Ed. 1153, 35 S. Ct. 712 (1915); *United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 5 L. Ed. 37 (1820). On this fundamen-

tal concept, arising as it does out of the separation of powers, Congress proceeded to exercise this power by classifying federal crimes either as (1) felonies, punishable by death or imprisonment for more than one year; (2) misdemeanors, as offenses other than felonies; or (3) petty offenses, as misdemeanors carrying a punishment of not more than 6 months' imprisonment and a fine of not more than $500.[7] Counsel may be provided at public expense under this statute only if the offense charged is punishable by more than 6 months' imprisonment. 18 U.S.C. § 3006A. So-called petty offenses are excluded. We know of no reason why the states cannot adopt a similar policy of providing free counsel in inferior courts for serious misdemeanors through similar legislation and appropriate the money with which to carry it out.

It is vigorously advanced as a phase of the policy argument that furnishing counsel to indigent defendants is not only right but practicable as well if the right applies only to misdemeanors of a serious nature and is not available in nonserious charges. We are thus asked to accomplish for the state judicially what in larger degree the Congress has done for the federal courts legislatively, i.e., to classify crimes differently than is now done by statute, to direct the appointment of counsel at public expense or without recompense to the bar, in all cases which ought to be deemed serious misdemeanors and to distinguish the serious misdemeanors from the thousands of minor and even trivial violations coming annually before the courts. But this argument, in essence, tries to persuade the court to go beyond its constitutional powers and embark upon a legislative program. It inevitably contemplates an exercise of judicial

---

[7] 18 U.S.C. § 1:

"Notwithstanding any Act of Congress to the contrary:

"(1) Any offense punishable by death or imprisonment for a term exceeding one year is a felony.

"(2) Any other offense is a misdemeanor.

"(3) Any misdemeanor, the penalty for which does not exceed imprisonment for a period of six months or a fine of not more than $500, or both, is a petty offense."

power which will compel the city of Seattle to furnish attorneys at public expense upon the whimsical basis that, although literally thousands of violations may legally invite serious punishment, only a few actually warrant it.

The declaration of such a policy will require the courts to assume additional powers they do not have and in exercising them to usurp in some degree the legislative and executive powers of government. To carry out the policy urged upon us, the court must decree that municipal courts have an inherent power not only to order counsel to serve without compensation, but also to direct the disbursement of public funds without an appropriation and, further, to reclassify crimes already defined and classified by the legislative branch. Parenthetically, we should, in passing, point out that our opinion in *Tacoma v. Heater*, 67 Wn.2d 733, 409 P.2d 867 (1966), does not stand for the proposition that the court in misdemeanors must provide counsel, but rather for the right to consult one's own retained counsel.

The power of the legislative branch of government, as earlier noted, to define crimes and prescribe punishment is virtually exclusive, nearly unlimited, and leaves practically no correlative power to do the same in the courts. *Morgan v. Devine, supra; United States v. Wiltberger, supra.* It is the legislature and subordinate legislative bodies and not the courts which ordain the punishment, subject only to the limitations that it be neither cruel nor inhuman, nor call for excessive fines. 21 Am. Jur. 2d *Criminal Law* § 590 (1965).

Since territorial days, Washington—along with most states and until recently the Congress—has classified crimes as misdemeanors, gross misdemeanors and felonies according to the maximum punishment prescribed by statute. Resting as they do largely on fixed and prescribed maximum punishments, these classifications present a fairly exact standard of far greater certainty than the standards now advocated by the appellant. If the decision to supply counsel at public cost rests on consideration of policy and not upon the constitution, counsel suggests that counsel be appointed only in those cases where it can rea-

sonably be said that the charge is a serious one—one which, on conviction, calls for a substantial jail sentence. In other words, the courts are asked to classify judicially some misdemeanors prima facie as petty offenses, much as the Congress has done legislatively in the Criminal Justice Act of 1964, 18 U.S.C. § 1.

Any such evaluation, of course, would necessarily have to be made in advance of or very early in the trial. We are asked to declare it a rule that the municipal court shall, before deciding guilt or innocence, judicially determine not only the seriousness of the crime charged, but the probable minimal sentence, basing its conclusions not on the punishment prescribed by law but rather from the nature of the charges and the likelihood of a substantial jail sentence on conviction. Aside from our questionable power to direct this, the inevitable consequence of such a policy will compel the busiest courts in our judicial system to proceed, case-by-case, to study carefully innumerable cases in advance of trial and ascertain not only whether the offense charged shall be classified as serious or minor, but also whether the defendant on trial will, upon conviction, deserve a serious or minor sentence. Just how, or at what point in the proceedings, a municipal judge would determine that the case on trial is serious enough to require appointment of counsel has not been made clear to us—unless of course, the court has been preadvised and come to some kind of prejudgment as to the gravity of the offense and the defendant's personal history and degree of involvement. Under defendant's proposal, the maximum punishment prescribed by law will not afford the court a basis for deciding just how serious the case may be.

Defendant here was charged in one complaint pursuant to ordinance 16046, with accompanying, congregating and loitering with a 13-year-old child after 10 p.m., to 3 a.m., in the public streets without the express consent of the minor's parents or guardian. In the other complaint under the same ordinance, the city charged defendant with the misdemeanor of petty larceny. Not until the case had been tried could the municipal court have known whether the offenses

charged were more serious than a breach of curfew and pilfering. Both charges, moreover, were cognizable in municipal court as disorderly conduct under ordinance 16046, Seattle code, § 12.11.020—an ordinance denouncing all kinds of misconduct, serious and trivial. *Seattle v. Franklin,* 191 Wash. 297, 70 P.2d 1049 (1937); *State ex rel. Belt v. Kennan,* 25 Wash. 621, 66 P. 62 (1901).

Unless the court had been preadvised and come to some kind of a prejudgment, it could not, before trial and conviction here, have judged the comparative seriousness of the offenses. All offenses arising under disorderly conduct ordinance 16046, such as fighting, drunkenness, disturbing the peace, use of profane, abusive or obscene language, the commission of indecent or immoral acts, or any practice or conduct tending to debauch the public morals, or to engage in any riotous or disorderly conduct, carry the same maximum punishment—not to exceed 6 months in jail and a fine of $500.

It is the penalty prescribed by law, therefore, that provides the basis for classifying crimes. The Supreme Court has so held in holding trial by jury mandatory where a simple battery under Louisiana law was punishable by 2 years' imprisonment. The court said in *Duncan v. Louisiana,* 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444 (1968), at 159:

> Crimes carrying possible penalties up to six months do not require a jury trial if they otherwise qualify as petty offenses, *Cheff v. Schnackenberg,* 384 U.S. 373 (1966). But the penalty authorized for a particular crime is of major relevance in determining whether it is serious or not and may in itself, if severe enough, subject the trial to the mandates of the Sixth Amendment. *District of Columbia v. Clawans,* 300 U.S. 617 (1937).

The defendant now advances a new system of classification, one inevitably requiring the court, before guilt has been established to decide, for example, if the drunkenness charged will be serious or petty, the fighting serious or petty, the use of profane or abusive language, or either, serious or petty—or whether the breach or disturbance of

the peace charged was serious or petty. This, of course, is a judgment the court cannot make judicially in most instances until it has heard the evidence, decided upon the guilt or innocence of the accused, and has been advised as to the circumstances of the crime and defendant's personal history. One act of public drunkenness may, in the court's judgment, be a petty matter—but the court may well regard the 100th offense as serious indeed. *See Seattle v. Hill,* 72 Wn.2d 778, 435 P.2d 692 (1968).

If we follow the policy advocated here, a misdemeanor, then, must be diagnosed by the municipal court in advance of trial either as serious, ordinary, petty, minor or trivial, depending not upon the maximum punishment allowable by law but rather on how a fair-minded judge with no knowledge of the defendant's history or the circumstances of the alleged offense gauges the seriousness of the crime and whether the defendant on conviction deserves substantial time in jail. The multitude of ordinances of Seattle which prescribe jail sentences for violations thereof, we think, would prevent the court from rationally accomplishing this in the discharge of its judicial duties.

A study of the city code of Seattle—and indeed nearly all city and state codes—we think shows that the same maximum sentences are prescribed for innumerable and different offenses. How could the court fairly determine from the complaint before it whether the offense is serious, ordinary, minor, petty or trivial until it has heard the evidence, learned the circumstances surrounding the commission of the offense, and is advised as to the defendant's personal history. Even overtime parking may warrant a substantial jail sentence when done repeatedly if the traffic tickets have been ignored by their recipient.

By way of illustration, here are some random samples of such legislation in Seattle: Under ordinance 63192, § 2, Seattle code § 16.04.060, sale of intoxicating liquor to minors is prohibited; it is likewise unlawful merely to be in a place where liquor is unlawfully kept for sale. Seattle code § 16.04.080, ordinance 37916. Each offense is punishable by a

fine of $300 or 90 days in jail or both (16.04.110)—assuredly a serious penalty to one who receives it.

Another example: Illegal disposition of garbage, swill and waste matter or disposing of it at improper times and places under the old ordinance of 1907, ordinance 15957, Seattle code 14.10.010, and the modern ordinance enacted in 1955, Seattle code, ch. 14.12, prescribing garbage dump fees, alike carry punishments of $300 fine and 90 days' imprisonment. One would be hard put in either case to decide the gravity of the offense without first hearing all of the evidence and a history of the defendant's prior behavior.

Or, under Seattle code, ch. 12.14, ordinance 45860 (1923), the portrait, effigy or name of any deceased president of the United States may not be used to advertise or call attention to any medicine, nostrum or method of medical treatment. This, for a first or, perhaps, even a second or third offense may, on its face, not seem serious, yet § 3 of the ordinance, 12.14.030, provides for a maximum punishment of $300 fine and 90 days in jail. The same punishment applies to soliciting magazine subscriptions on the public streets or sidewalks for future delivery. Seattle code 12.15.010, *et seq.* Similarly, Seattle code ch. 12.17 purports to make it a serious misdemeanor to sell automobiles on Sunday in Seattle, fixing the punishment at a maximum of 90 days in jail or $300 fine and making each day's violation a separate offense —all under ordinance 86065 of April 23, 1957.

Curiously enough, although selling unclean, unhealthful or adulterated meat might seem to be a more serious offense than selling cars on Sunday, yet the punishment for doing either under Seattle ordinance 94465, § 35, of January 6, 1966, Seattle code § 13.08.350, carries the same maximum of 90 days in jail and $300 fine. The same punishment applies to selling unclean and adulterated poultry and fish (ch. 13.12) and milk. 13.24.585, ordinance 84106 (1955).

Seattle's legislative branch of government takes a rather serious view of tax evasion, too. It has made it a misdemeanor punishable by 90 days' imprisonment in city jail and a fine of $300 for cabarets, theaters, and others offering

entertainment to fail to collect or remit on authorized returns, the city amusement tax (11.04.140, ordinance 72495, § 13 (1943)), and to pay the business and occupation tax. 11.08.310, ordinance 72630, § 30 (1943).

Leaving these examples of offenses punishable by 90 days' imprisonment and a $300 fine, we next refer to a few random samples of even more serious offenses in the Seattle code. Violations of chapter 12.11 obviously are more serious than the offenses just described because they carry a much greater maximum punishment; they are punishable by sentences of up to 6 months in jail and $500 in fine or both. Misdemeanors under chapter 12.11 include such offenses as habitually idling away one's time in places where intoxicating liquors are sold, 12.11.110; fighting by agreement (the section does not indicate what happens if one of the participants does not agree), 12.11.070; prowling or loitering by convicted felons, 12.11.100; soliciting alms, 12.11.130; or operating as an employer a place open to the public for the sale of intoxicating liquor; allowing or causing any female employee to appear with the upper and/or lower torso wholly or substantially exposed to public view, 12.11.175, ordinance 94554, February 21, 1966; or for any male person to idle away his time in any house of ill fame, 12.11.120. All such violations in the court's discretion draw sentences of up to 6 months in jail or a $500 fine or both.

Other offenses, punishable by 6 months in jail and a $500 fine involve a miscellaneous assortment of violations under the Seattle code such as injuring another's flowers, foliage and shrubbery, 12.11.560; allowing minors under 18 to loiter or play in one's billiard or pool room, 12.11.530; rudely or mischievously throwing things at any house, building or vehicle to anyone's annoyance, 12.11.510; or wearing hats during the performance in any theater or for any theater manager to allow his customers to wear any hats or bonnets in the theater, 12.11.410 and .420; or to sell or give tobacco in any form to anyone under the age of 18 years, 12.11.430, ordinance 87651 (1958). Along with these, we should not ignore the plethora of offenses defined in the

motor vehicle statutes and municipal traffic codes which generate tens of thousands of cases annually throughout the state, all of which are punishable by substantial jail sentences.

A study of the municipal codes particularly will show that city courts, whether they be designated as police courts, municipal courts or district justice of the peace courts, have been designed to handle effectively and fairly large volumes of judicial business at minimum cost and delay. It is now suggested that, without legislative sanction and in the absence of constitutional mandate, we virtually convert these courts into courts of record—inevitably bringing with this change the attendant delays, expenses, and traditional inefficiencies indigenous to but now so dramatically burdening the courts of record throughout the country.

There is a likelihood that a decision directing the appointment of counsel here would mark but a beginning. The right to counsel at public expense in courts of limited jurisdiction in serious misdemeanor cases will inevitably give rise to a corresponding duty upon the city not only to furnish counsel but to augment and render counsel's efforts more effective—as is now done in superior courts—by furnishing psychiatric examinations, court reporters and laboratory and clinical services, and in some instances providing investigators. The decision to provide any of these services without cost in courts of limited jurisdiction, we think, should not be preempted by the courts but left with that branch of government which has the power to levy the taxes, appropriate the money and employ and pay the personnel essential to do the job. It is not for the courts, in generating a new policy, to cast another great load upon the judicial system until they have found ways of carrying the ones that have been with the judicial system for so long a time. The decision to afford such public services belongs to the legislative and not the judicial branch of government.

Not long ago this court, in adopting Rules for Courts of Limited Jurisdiction, RCW vol. 0, tacitly acknowledged

that the right to counsel at public expense in prosecution for misdemeanors is to be conferred, if at all, by the legislature and does not rest on constitutional principles or arise from a judicial policy. Nowhere in those rules is it intimated that courts of limited jurisdiction are obliged, or have the power, to order counsel to serve indigent persons without compensation. Not until now has it been seriously contended in this state that justice of the peace courts, police courts or municipal courts possess the power to compel attorneys to serve without recompense, and no constitutional or historical authority has been shown us that these courts possess such powers. If, as a matter of judicial policy, it is held that these courts possess such powers, it may be a step forward in the administration of criminal justice, but there are possible public detriments in such a policy which must be considered, too.

In all probability, the advent of counsel at public expense for indigents in all serious misdemeanors will, in the course of time, enormously increase the volume of contested cases and lengthen the delays already overburdening our judicial system. It may engender such an increase in the costs of running these courts that the prosecuting officials will be forced to dismiss innumerable cases rather than incur the expense and delay involved in supplying counsel at public expense. And, there is another problem—the probability that substantial segments of the police, sheriffs' deputies, state patrol and other law enforcement agencies will be partially immobilized because of their required attendance in courts of limited jurisdiction waiting overlong to testify when their time should be and is better spent in going about their duties preserving the public peace and safety.

If anyone doubts these consequences, let him examine the rise in criminal appeals to the Supreme Court in recent years. Since 1962, an enormous increase in appeals to the Supreme Court has taken place, a steadily increasing percentage of which is brought at public expense. Should this trend continue at the present rate under existing procedure, nearly all of this court's time and energy will be preempted by criminal cases to the exclusion of practically

all others. In all likelihood, the providing of appointed counsel in municipal courts and justice courts will add to the number of contested cases bringing a commensurate increase in appeals therefrom to the superior and thence to the Supreme Court—all at public expense.[8]

We think none of these disabilities and burdens is forced upon the courts by the constitutions nor should be as a matter of judicial policy. If an indigent accused feels aggrieved at the results of his trial in municipal court, he may appeal to the superior court. If, because of special or disabling circumstances such as the youth, inexperience, or physical or mental disabilities, the superior court is of the view both that the misdemeanor is of such seriousness and the special circumstances affecting the defendant warrant it, that court may appoint counsel at public expense in the sound exercise of its discretion.

The cause is reversed with directions that the defendant's appeal to the superior court be reinstated and he be allowed to prosecute it.

HUNTER, C. J., concurs.

NEILL and McGOVERN, JJ., and DONWORTH, J. Pro Tem., concur in the result.

ROSELLINI, J. (dissenting)—The majority of this court has determined that a young man, charged with an offense

[8]The records of the Clerk of the Supreme Court show the following numbers of criminal appeals filed in the Supreme Court and the percentages of indigent appeals for the following years:

| Year | Total Criminal Appeals | Indigent Appeals | Percentage* Increase-Decrease |
|---|---|---|---|
| 1962 | 75 | 32 | % 42 |
| 1963 | 75 | 35 | 46 |
| 1964 | 101 | 49 | 48 |
| 1965 | 136 | 64 | 47 |
| 1966 | 164 | 79 | 48 |
| 1967 | 222 | 131 | 59 |
| 1968** | 90 | 56 | 62 |

*. Percentage indigent of total appeals.
** For 6 months, January 1 through June 30, 1968.

for which the punishment may mean deprivation of liberty for a year of his life, is not entitled to be represented by counsel unless he can afford to pay the lawyer's fee. In doing so, it has recognized that, if the defendant were a year or so younger and had been brought before the juvenile court for his offense, he would have been entitled to the appointment of counsel at public expense if he could not afford to pay counsel; and that, if his offense had been of a slightly more serious nature punishable by confinement in the state penitentiary rather than in the city jail, he would have had the same right. But, because the United States Supreme Court has not passed on the question, the majority finds it convenient to suppose that that court would find some significant peculiarity in the plight of the defendant which would exclude him from the protection of the constitution.

Courts are currently under attack for "coddling" criminals, and the United States Supreme Court takes most of the brunt of this. It seems to me that the reason for this is that state courts have too often been reluctant to enforce the plain provisions of the constitution, preferring to pass the "onus" on to the highest court in the land.[9] It has never been supposed that courts would make themselves popular by giving effect to the constitutional guarantees, but that does not make it any the less their duty to do so. It was because the framers recognized that public zeal to "get the culprit" would stimulate the adoption of shortcuts calcu-

[9]The fact that this court has been timid in giving effect to constitutional rights can hardly be ignored. In the past 10 years, the highest court in the land has found it necessary to reverse or remand for reconsideration opinions of this court in the following cases involving rights of criminal defendants: *Eskridge v. Washington State Board of Prison Terms & Paroles,* 357 U.S. 214, 2 L. Ed. 2d 1269, 78 S. Ct. 1061 (1958); *Ross v. Schneckloth,* 357 U.S. 575, 2 L. Ed. 2d 1547, 78 S. Ct. 1387 (1958); *In re Woods v. Rhay,* 357 U.S. 575, 2 L. Ed. 2d 1547, 78 S. Ct. 1387 (1958); *Draper v. Washington,* 372 U.S. 487, 9 L. Ed. 2d 899, 83 S. Ct. 774 (1963); *Haynes v. Washington,* 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336 (1963); *See v. Seattle,* 387 U.S. 541, 18 L. Ed. 2d 943, 87 S. Ct. 1737 (1967); *Mempa v. Rhay,* 389 U.S. 128, 19 L. Ed. 2d 336, 88 S. Ct. 254 (1967); and *McConnell v. Rhay, Stiltner v. Rhay,* 393 U.S. 2, 21 L. Ed. 2d 2, 89 S. Ct. 32 (1968).

lated to result in injustice, that the constitutional safeguards were enacted. But the constitution is only a piece of paper if the courts will not give effect to its true intent and meaning; and if courts are to do that, they cannot afford to let themselves be deterred by fear of public disapproval. Judges must realize that such disapproval is the result of ignorance, and that any member of the public who understands the history of his country and its constitution will not be dismayed but will rejoice when he knows that the courts are firm in protecting the rights of the individual when the power of organized society threatens his liberty.

While the majority does not say that it fears that to sustain the holding of the superior court in this case would incite public indignation, it is difficult for me to avoid the conclusion that such a fear has influenced the decision. I say this because the only positive rationale I can find in the majority opinion is that the furnishing of counsel to indigent persons charged with serious misdemeanors—that is, misdemeanors involving a possible loss of liberty—would be expensive and would interfere with the *expeditious* handling of misdemeanor cases. The other reasons offered are all of negative import: (1) The question has not been decided by the United States Supreme Court, which so far has entertained only felony cases; (2) if such a right exists, the legislature has not seen fit to implement it with an appropriation of funds to pay counsel; and (3) it has not been the custom to furnish counsel to indigents in misdemeanor cases.

I do not believe that any of these considerations, either the positive or the negative, have much bearing on the merits of the question before us, and certainly they should not be determinative. Where is the discussion of the language of the constitutional provisions? The provisions themselves are only set forth in a footnote, and no further attention is paid to their contents. Conceding that there are no United States Supreme Court decisions directly in point, certainly the reasoning employed in the felony cases would be of interest in arriving at a proper interpretation of the meaning of the constitutional provisions in question. Is not

the traditional judicial technique of reasoning by analogy available? One must assume that if there are analogous cases, they do not aid the majority view, else they would surely be cited and quoted. In a legal opinion, they would be considerably more persuasive than an economic argument, which the majority concedes cannot control if a constitutional right is found to exist.

Nowhere in the majority opinion do I find any discussion of the reasons why counsel might be needed in misdemeanor cases or, on the other hand, of why it is that justice can be obtained by a defendant so charged without aid of counsel. If counsel is not needed in "summary" courts, perhaps superior courts could be more efficiently conducted if summary court procedures were adopted there. This would result in an even greater expediting of criminal cases and a great saving to the public. Unfortunately for the exponents of unfettered efficiency, the United States Supreme Court has spoken on this matter, and this reform cannot be inaugurated under the constitution as it now stands.

There are cases in other jurisdictions which supposedly support the majority view. A few of them are cited, since they are the cases in which the United States Supreme Court denied certiorari. One would expect to find in the majority opinion some morsels of judicial reasoning gleaned from those opinions, but apparently they were not found to be sufficiently impressive to merit quoting. I will return to them later in this dissent.

Not only is the majority opinion lacking in the usual discussion of fortifying cases, it has also adopted at least one rule of "statutory construction" which is new, at least to me, and which is not supported by citation of precedent. I refer to the inference inherent in the opinion that, if the legislature has not seen fit to implement an alleged constitutional right, that right probably does not exist. This is accomplished by a judicial gymnastic whereby the rule that acts of the legislature are presumed constitutional does a backward flip with a side twist and comes out to read, "If there is a constitutional right, it is presumed that the legis-

lature will implement it; and if the legislature does not implement an alleged right, ipso facto there is no right." The result of this, of course, is that it is now the legislature, and not the court, which is charged with the responsibility of interpreting the constitution.

This little concept appears to be a fungus growing on the roots of the idea that, if the court appoints counsel to represent an indigent, counsel must be paid and counsel cannot be paid if there is no appropriation. The basic fallacy, of course, is the assumption that, before the court can decide whether the defendant is entitled to have court-appointed counsel, it must ascertain how and whether counsel will be paid. This assumption is another by-product of the economic approach to constitutional interpretation. Under this approach, it is not the court's function to declare the meaning of words found in the constitution, but to determine what solution to the problem presented will be the least expensive to the public, and to adjust the constitution to accommodate that solution. Of course, the court has a distinct advantage in making this kind of determination, since it has rather limited investigative powers and thus is not required to sift through a lot of dull and conflicting data before reaching a conclusion, but can do it on the basis of whatever information has been brought before it in the briefs of litigants, plus a little judicial knowledge and instinct.

I do not conceive that the question of how and whether counsel will be paid is before the court. The fact is that the trial court is ready and willing and apparently able to appoint counsel. No one disputes it. If the right exists, and it is for this court to declare whether it does or not, it will be implemented, barring a breakdown or overthrow of the government.[10]

---

[10]It is interesting to note that King County Justice Court judges and Seattle Municipal Court judges recognize the constitutional right to appointment of attorneys for indigents.

In King County, the Board of County Commissioners has provided $500 for each District Court requesting funds for appointed counsel. The judge of each district sets the standards of indigent qualification

While I do not consider the matter material to the question before the court, I think the misdemeanor statistics quoted by the majority deserve a comment since so much importance is attached to them in the opinion. The number of misdemeanor cases and/or traffic cases heard in recent years is there set forth without any attempt to segregate those involving indigent defendants from those involving defendants able to afford counsel. There is not even a citation of the number who were actually represented by counsel. Unless it is the contention of the majority that all misdemeanants and traffic offenders are indigent, the statistics do not contribute a great deal to the court's conception of the probable impact on the trial of misdemeanor cases of a holding that indigents as well as nonindigents are entitled to counsel. Yet it is this citing of statistics which is accorded the position of highest honor in the opinion, leading to the impassioned holding set forth in the paragraph which follows it.

But enough of this quibbling with the majority opinion. On to the merits!

The United States Supreme Court, in a series of cases, has defined the right of a person charged with crime to the assistance of counsel in his defense. In *Johnson v. Zerbst,* 304 U.S. 458, 462-63, 82 L. Ed. 1461, 58 S. Ct. 1019 (1938), the defendant had been charged in federal district court with uttering and passing counterfeit money. He requested that counsel should be appointed to defend him, and was told that the court did not appoint counsel for a defendant unless he was charged with a capital crime. He was tried and convicted without counsel, and confined in the federal penitentiary. He petitioned for a writ of habeas corpus,

and appoints local counsel from panels of attorneys who have indicated that they are willing to serve in this capacity.

In Seattle, a slightly different approach has been proposed by the Seattle Municipal Judges and approved by the City Council. With a fund of $25,000 approved, the Seattle Municipal Court will employ one full-time attorney at $13,500 and one part-time attorney at $3,000 as public defenders. The first attorney will devote most of his time to trials, the second will devote most of his time to screening applicants. In addition the judges hope for additional support from Seattle young attorneys.

which was denied by the lower federal courts. The United States Supreme Court reversed. The court, speaking through Mr. Justice Black, said:

> The Sixth Amendment guarantees that "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This is one of the safeguards of the Sixth Amendment deemed necessary to insure fundamental human rights of life and liberty. Omitted from the Constitution as originally adopted, provisions of this and other Amendments were submitted by the first Congress convened under that Constitution as essential barriers against arbitrary or unjust deprivation of human rights. The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not "still be done." It embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel. That which is simple, orderly and necessary to the lawyer, to the untrained layman may appear intricate, complex and mysterious. Consistently with the wise policy of the Sixth Amendment and other parts of our fundamental charter, this Court has pointed to ". . . the humane policy of the modern criminal law . . ." which now provides that a defendant ". . . if he be poor, . . . may have counsel furnished him by the state . . . not infrequently . . . more able than the attorney for the state."
>
> . . . The Sixth Amendment withholds from federal courts, in all criminal proceedings, the power and authority to deprive an accused of his life or liberty unless he has or waives the assistance of counsel.

(Footnotes omitted.)

It will be noted that *Johnson v. Zerbst, supra,* applied to criminal prosecutions in federal courts, and did not involve trials in the state court.

In the case of *Uveges v. Pennsylvania,* 335 U.S. 437, 441, 93 L. Ed. 127, 69 S. Ct. 184 (1948), the court referred to a difference of opinion among the members of the Supreme Court, one view being that where a person is charged with a serious offense in state court, the court must offer counsel

for his defense, and failure to do so deprives him of a constitutional right; the other view being that where capital punishment is not involved, the constitutional right to counsel depends upon the circumstances of the particular case. The court said:

> The philosophy behind both of these views is that the due process clause of the Fourteenth Amendment or the Fifth Amendment requires counsel for all persons charged with serious crimes, when necessary for their adequate defense, in order that such persons may be advised how to conduct their trials.

In *Gideon v. Wainwright*, 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792, 93 A.L.R.2d 733 (1963), the Supreme Court overruled its prior decision in *Betts v. Brady*, 316 U.S. 455, 86 L. Ed. 1595, 62 S. Ct. 1252 (1942), which had held that the states were not bound to furnish counsel to indigent defendants charged with a criminal offense. The court, in referring to precedents which should have indicated a contrary result in *Betts v. Brady, supra,* said, at 344:

> Not only these precedents but also reason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him. This seems to us to be an obvious truth. Governments, both state and federal, quite properly spend vast sums of money to establish machinery to try defendants accused of crime. Lawyers to prosecute are everywhere deemed essential to protect the public's interest in an orderly society. Similarly, there are few defendants charged with crime, few indeed, who fail to hire the best lawyers they can get to prepare and present their defenses. That government hires lawyers to prosecute and defendants who have the money hire lawyers to defend are the strongest indications of the widespread belief that lawyers in criminal courts are necessities, not luxuries. The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every de-

fendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him.

In *Miranda v. Arizona,* 384 U.S. 436, 472-73, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), the court held that when a person is arrested in connection with a criminal offense, before the police may question him they must advise him of his constitutional rights, including the "right to the presence of an attorney, either retained or appointed." The court further said:

> The need for counsel in order to protect the privilege exists for the indigent as well as the affluent. In fact, were we to limit these constitutional rights to those who can retain an attorney, our decisions today would be of little significance. The cases before us as well as the vast majority of confession cases with which we have dealt in the past involve those unable to retain counsel. While authorities are not required to relieve the accused of his poverty, they have the obligation not to take advantage of indigence in the administration of justice. Denial of counsel to the indigent at the time of interrogation while allowing an attorney to those who can afford one would be no more supportable by reason or logic than the similar situation at trial and on appeal struck down in *Gideon v. Wainwright,* 372 U.S. 335 (1963), and *Douglas v. California,* 372 U.S. 353 (1963).
>
> In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him.

(Footnotes omitted.) *See also Patterson v. Warden,* 372 U.S. 776, 10 L. Ed. 2d 137, 83 S. Ct. 1103 (1963).

In *Tacoma v. Heater,* 67 Wn.2d 733, 409 P.2d 867 (1966), we held that a person arrested for drunken driving was entitled to the services of employed counsel immediately after he was charged, under article 1, section 22 (amendment 10) of the Washington Constitution and the sixth amendment to the United States Constitution. We observed the fact that the court, in *Gideon v. Wainwright, supra,* made no distinction between felonies and misdemeanors in

its discussion of the constitutional right to have the assistance of counsel in criminal prosecutions.

While the language in *Tacoma v. Heater, supra,* is perhaps broader than the facts of the case require, the trial court in this case did not find it necessary to interpret it as holding that there is a right to counsel in all misdemeanor cases, but deemed it sufficient that it was authority for the proposition that there is a right to counsel in all prosecutions involving serious offenses, whether they be felonies or misdemeanors. The offenses charged in this case, although designated "disorderly conduct," were in fact larceny and contributing to the delinquency of a minor, both of which are embraced within the criminal law of this state. RCW 9.54.010, *et seq.;* RCW 13.04.170.

Upon the authority of the cited decisions of the United States Supreme Court, pertaining to felonies but not restricted in their language to such crimes, and *Tacoma v. Heater, supra,* holding that the right to employ counsel of one's own choosing exists in misdemeanor cases as well as felony cases, I join the trial court in concluding that the respondent was entitled to have counsel appointed at public expense to assist him in his defense of the serious charges brought against him in this case, even though they were labeled disorderly conduct.

The appellant cites the following cases as authority for the proposition that an indigent is not entitled to have appointed counsel in a prosecution for a misdemeanor: (1) *Winters v. Beck,* 239 Ark. 1151, 397 S.W.2d 364 (1966), *cert. denied* 385 U.S. 907, 17 L. Ed. 2d 137, 87 S. Ct. 207 (1966), wherein the Arkansas Supreme Court refused to extend the holding of *Gideon* to misdemeanor cases. The defendant was found guilty of "immorality" and sentenced to 30 days in jail and a fine of $254. The opinion does not state whether there is a statutory crime of "immorality" in Arkansas. I know of none in this state or at common law. (2) *State v. Davis,* 2 Conn. Cir. 257, 197 A.2d 668 (1963), wherein the court held that it need not consider a contention of a defendant charged with obtaining money under false pretenses and impersonating an attorney that he was

denied his right to court-appointed counsel inasmuch as he had not raised the issue at the trial level or claimed the denial as error in his brief. A statement in the opinion that one charged with a misdemeanor is not entitled, as a matter of right, to appointment of counsel was therefore dictum, or was at most a holding that, to avail himself of the right, he must claim it at the trial level. (3) *State v. DeJoseph,* 3 Conn. Cir. 624, 222 A.2d 752 (1966), *cert. denied* 385 U.S. 982, 17 L. Ed. 2d 443, 87 S. Ct. 526 (1966), wherein it was held that the fact of indigency was not proved, and therefore the trial court did not commit reversible error in refusing to appoint counsel for a man charged with nonsupport. (4) *Watkins v. Morris,* 179 So.2d 348 (Fla. 1965). (5) *Fish v. State,* 159 So.2d 866 (Fla. 1964). The last two cases were decided by the court which had denied the rights of the defendant in *Gideon,* and it is not altogether surprising that it refused to read that pronouncement of the United States Supreme Court as applicable to any crimes other than felonies. The alleged misdemeanor in *Watkins v. Morris, supra,* was driving while intoxicated and reckless driving. In that case the court also based its holding on the fact that the defendant actually did not claim that he was indigent. The nature of the offense charged in *Fish v. State, supra,* is not revealed in the opinion.

It will be seen that in only two of the cases cited by the appellant was it squarely held that an indigent charged with a misdemeanor was not entitled to counsel. Neither of them involved a serious offense, so far as the opinions reveal. Assuming, however, that the offense involved in the last cited Florida case may have been serious, I must also note that neither the opinion in that case nor the other Florida case cited contains any discussion of the constitutional provisions. In effect, in both cases, the court refused to consider the contentions of the defendant. I do not find them persuasive authority.

The respondent cites the following cases in which federal courts have held that the right to counsel applies in misdemeanor prosecutions. *Evans v. Rives,* 126 F.2d 633 (D.C. Cir. 1942); *Harvey v. Mississippi,* 340 F.2d 263 (5th Cir.

1965) and *McDonald v. Moore*, 353 F.2d 106 (5th Cir. 1965). He also calls our attention to *Patterson v. Warden, supra,* where the Supreme Court in a per curiam opinion remanded a case for reconsideration in the light of *Gideon v. Wainwright, supra.* The request of the defendant in that case, charged with misdemeanors involving a 2-year sentence, that the court appoint counsel to represent him, had been denied.

The court in *Evans v. Rives, supra,* held that the right exists in all misdemeanor cases. The cases of *Harvey v. Mississippi, supra,* and *McDonald v. Moore, supra,* are not so broad in their language, but they do not attempt to delineate in general terms the boundaries of the constitutional right to the assistance of counsel.

The appellant concedes that there may be misdemeanors of such a serious nature that an indigent defendant charged with one of them should enjoy the right to counsel guaranteed by the sixth amendment to the United States Constitution and article 1, section 22 (amendment 10) of the Washington Constitution. It suggests that the definition contained in 18 U.S.C. § 1(3) (1965) is appropriate. That section provides:

> Any misdemeanor, the penalty for which does not exceed imprisonment for a period of six months or a fine of not more than $500, or both, is a petty offense.

It is true that this court recognized that provision in *George v. Day,* 69 Wn.2d 836, 420 P.2d 677 (1966), and held that a defendant charged with drunken and reckless driving, the penalty for which (in municipal court in a city of the third class) could not exceed $300 or 90 days in jail, was not entitled to a jury trial. We did not discuss or apply any standard other than the "severity of the penalty" in determining whether the offense was serious or petty.

The respondent also proposes that the court should adopt a standard related solely to the penalty, but he suggests that any charge involving the possible loss of liberty, for any period of time, should bring into play the constitutional provisions.

Inasmuch as the United States Supreme Court has not yet rendered an opinion on the subject of the rights of an indigent misdemeanant, I must look to analogy for assistance in my endeavor to determine the intended scope of these provisions, and fortunately I am aided by two opinions of that court in this regard.

The first of these is *In re Gault,* 387 U.S. 1, 41, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967), holding that a judge of a juvenile court was required by the constitution to advise a minor and his parents that counsel would be appointed to represent him, if he could not afford to hire an attorney, where he was charged as a delinquent for the commission of a minor offense.

The majority recognizes that the United States Supreme Court held in that case that a minor charged as a delinquent is entitled to the appointment of counsel at public expense, but it suggests that the court's holding was based on its finding that the offense was as serious as a felony. This is not the case. The alleged offense of the child in that case was the making of an "obscene" telephone call. The comparable "adult" crime was a misdemeanor, the using of vulgar or obscene language in the presence of a woman or child, and the punishment was a fine of from $5 to $50 or imprisonment for not more than 2 months.

It was not the seriousness of the offense which concerned the court, but the seriousness of the punishment. Here is the holding of the court:

> We conclude that the Due Process Clause of the Fourteenth Amendment requires that in respect of proceedings to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed, the child and his parents must be notified of the child's right to be represented by counsel retained by them, or if they are unable to afford counsel, that counsel will be appointed to represent the child.

The United States Supreme Court, in enunciating this holding, did not restrict it to cases in which the child is threatened with confinement for a particular length of time, but said that if he may be committed to an institution

in which his freedom will be curtailed, he is entitled to counsel.

Jail is such an institution, and a person who is sent to jail for 1 year has his freedom curtailed just as seriously as if he were sent to a state penal institution for a year.

While the United States Supreme Court in the *Gault* case made the seriousness of the punishment the determining factor in deciding whether a juvenile should be accorded due process, I do not think that that court would necessarily adopt this standard in determining whether an adult charged with an offense is entitled to appointment of counsel to represent him. I say this because in the past, as will be presently discussed, that court has recognized a distinction between petty and serious offenses, and held that there is a right to a jury trial if the offense is serious, even though it be classified as a misdemeanor. *Callan v. Wilson,* 127 U.S. 540, 32 L. Ed. 223, 8 S. Ct. 1301 (1888). In light of these two cases, I would assume that the United States Supreme Court would hold that a defendant is entitled to appointment of counsel, if he is indigent, if he has been charged with a serious offense, or if the punishment is one which usually accompanies a serious offense.

The case of *Callan v. Wilson, supra,* pertained to the right of trial by jury, a right also protected by the Sixth Amendment, in misdemeanor cases.

Mr. Justice Harlan, the writer of the opinion, reviewed a number of cases in lesser courts wherein it had been held that, at common law, there was a class of petty offenses which were triable summarily without a jury. He said, at 127 U.S. 553:

> The doctrines of many of the cases are thus summarized by Mr. Dillon in his work on Municipal Corporations (Vol. I, § 433): "Violations of municipal by-laws proper, such as fall within the description of municipal police regulations, as, for example, those concerning markets, streets, waterworks, city officers, etc., and which relate to acts and omissions that are not embraced in the general criminal legislation of the State, the legislature may authorize to be prosecuted in a summary manner, by and in the name of the corporation, and need not

provide for a trial by jury. Such acts and omissions are not crimes or misdemeanors to which the constitutional right of trial by jury extends."

The defendant in that case was charged with a conspiracy (as a member of a trade union) in police court in the District of Columbia. The sentence imposed upon conviction was a fine of $25 or a jail sentence of 30 days. The Supreme Court concluded, at 127 U.S. 555:

> Without further reference to the authorities, and conceding, that there is a class of petty or minor offences, not usually embraced in public criminal statutes, and not of the class or grade triable at common law by a jury, and which, if committed in this District, may, under the authority of Congress, be tried by the court and without a jury, we are of opinion that the offence with which the appellant is charged does not belong to that class. A conspiracy such as is charged against him and his codefendants is by no means a petty or trivial offence.

There follows in the opinion a discussion of the common law crime of conspiracy, and then the court concludes, at 127 U.S. 557:

> Except in that class or grade of offences called petty offences, which, according to the common law, may be proceeded against summarily in any tribunal legally constituted for that purpose, the guarantee of an impartial jury to the accused in a criminal prosecution, conducted either in the name, or by or under the authority of, the United States, secures to him the right to enjoy that mode of trial from the first moment, and in whatever court, he is put on trial for the offence charged.

That case is still the law of the land. It was cited for the proposition that a jury trial is not required for petty offenses, as the leading case, as recently as June 1966 in the opinion in *Cheff v. Schnackenberg,* 384 U.S. 373, 16 L. Ed. 2d 629, 86 S. Ct. 1523 (1966). It was also cited by this court in our own leading case of *State ex rel. Belt v. Kennan,* 25 Wash. 621, 66 P. 62 (1901), holding that "riotous conduct" (not involving "riot") was a petty offense not requiring trial by jury. This court also approved the same quotation from 1 Dillon, Municipal Corporations (4th ed. 1890) § 433,

and made this significant statement in that opinion, at 25 Wash. 626:

> It will be observed in the discussion of this question and in an examination of the authorities that the courts look to the *nature of the offense*, rather than to its designation by name, so that but little profit is found in refining upon the definition of misdemeanors. It is the petty nature of the offense which usage has placed in the jurisdiction of municipalities, and which offenses are not usually designated in the body of the criminal law as public crimes. And, too, the *punishment is made to fit the crime*. It is limited, and precedents are found where courts have adjudged such ordinances void because the penalty was too severe. The reasons for such summary jurisdiction are numerous and apparent, and the custom almost universally exists, and is consistent with the fullest and completest protection of the most sacred guaranties of the constitution.

(Italics mine.)

The case was cited with approval in *Bellingham v. Hite,* 37 Wn.2d 652, 225 P.2d 895 (1950). This court in that case found it unnecessary to decide whether drunken driving is a serious or petty offense, inasmuch as it held that the defendant's right to trial by jury was secured to him by such a trial on appeal to superior court.[11] This, of course,

---

[11]It has been suggested that the appointment of counsel on appeal to the superior court is adequate to secure the proper defense of an indigent. Not only has this argument, as applied to the right of trial by jury, been rejected by the United States Supreme Court, there is evidence before us which illustrates its fallacy.

Where an indigent defendant appeals from a conviction in municipal court, it is the custom of most superior court judges, if asked to do so, to appoint counsel for the defendant for the trial in superior court. This is done so that the case will be tried in an orderly fashion, due process will be more likely to be accorded, and time will be saved for the court, the city attorney and the jury.

This postconviction remedy, however, does not eliminate the evils which result from the denial of counsel at the municipal court level. Studies made of the appeals to the superior court, for de novo trials, following conviction in the Seattle Municipal Criminal Court, illustrate this clearly.

In 1965, a group of law students from the University of Washington School of Law gathered some basic data concerning the operation of the Criminal Division of the Seattle Municipal Court and prepared a

was out of harmony with *Callan v. Wilson, supra,* which had held to the contrary. But this court was of the opinion at that time that the guarantees of the federal constitution are limitations solely on the powers of the federal government. *Gideon v. Wainwright, supra,* decided later, held to the contrary, and *Bellingham v. Hite, supra,* is no longer authority for that proposition.

The same quotation from 1 Dillon, Municipal Corpora-

paper entitled *Report of King County Survey Regarding the Need for Counsel Provided by the State.* A statistical sample taken from the year 1964 showed that 78 per cent of the cases disposed of in the court were based on charges of drunkeness. Approximately 12 per cent of the defendants charged with drunkeness and about 30 per cent of those charged with other misdemeanors were sentenced to jail. Approximately one half of one per cent of the defendants charged with drunkeness, and about 11 per cent of those charged with other crimes, hire counsel to represent them.

A recent study, conducted by volunteers working for the Seattle-King County Legal Services Center, concerned appeals taken from the municipal police court in 1966. It indicated that convictions based on approximately 390 charges were appealed from the municipal police court. Out of a sample of 25 per cent of these charges, or 94, that were closely examined, only two were charges of drunkenness. This means that of the 390-odd cases appealed from the police court, approximately 380 were based on charges other than drunkenness.

Now, using this as a background, the startling statistic is this: Of the 94 charges which were appealed, 62 had been defended by hired counsel in municipal court. Thus, in two thirds of the cases which were appealed, or about 253 out of 380 which were not drunkenness charges, hired counsel had been present in municipal court. These figures certainly seem to indicate that the presence of counsel in municipal court is a tremendously important factor in the exercise of the right to appeal. But there is more to the story than this.

Of the 94 charges examined which were appealed in 1966, the average appeal bond which was set was in excess of $925. It should be noted that many defendants were appealing several charges, so that often a defendant was faced with posting an appeal bond of as much as $2,500, and the amount at times reached $5,000. To post such a bond would require the payment of a premium of from $250 to $500. Undoubtedly, the indigent defendant would have to remain in jail pending his appeal.

In addition to this, an examination of the cases appealed to the King County Superior Court shows that there was an interval of approximately 90 days between the filing of the appeal in municipal court and the trial de novo in the superior court. Taken all together, this means that the indigent defendant, the man who cannot afford counsel in the municipal prosecution, also probably cannot pay the

tions (4th ed. 1890), § 433, is found again in *State ex rel. O'Brien v. Towne*, 64 Wn.2d 581, 392 P.2d 818 (1964), holding that the defendant, charged with petty traffic offenses, was not denied a constitutional right when his request for a jury trial was refused. In that case, we also quoted extensively from *Callan v. Wilson, supra.* The rule was also recognized in *State v. McCaw*, 198 Wash. 345, 347, 88 P.2d 444 (1939), holding that where the defendant was entitled to a jury trial, he could not waive it except by a plea of guilty or admission of the truth of the charge. The defendant in that case was charged with a misdemeanor, contributing to the delinquency of a minor. In answer to the contention that Rem. Rev. Stat. § 2309 (superseded by RCW 10.01.060) providing that crimes must be tried by jury, applied only to felonies, this court said:

> Our statute, Rem. Rev. Stat., § 2253 [P. C. § 8688], defines as crimes all acts or omissions forbidden by law. A different name is given to each degree of crime based upon the punishment to be inflicted in the event of conviction. Felonies, misdemeanors, and gross misdemeanors are each denominated crimes within the meaning of that section of the statute.

> Every defendant charged with a crime, whether it be a felony, misdemeanor, or gross misdemeanor, must be tried by a jury in accordance with the mandate of Rem. Rev. Stat., § 2309. There are certain petty crimes and minor offenses which are excepted from the rule stated in the statute. *State ex rel. Belt v. Kennan*, 25 Wash. 621, 66 Pac. 62; *Callan v. Wilson*, 127 U.S. 540, 32 L. Ed. 223, 8

bond premium, and so, because of his poverty, is forced to stay in jail pending his trial de novo. Thus, if he is sentenced to 90 days or less in municipal court, his right of appeal avails him little, for his sentence will expire before the superior court can give him relief. Or, if he is sentenced to more than 90 days, he is bound to serve at least a 90-day sentence even though he seeks to avail himself of the right to trial de novo.

This should indicate how crucial the municipal court prosecution is to the indigent. If he is not afforded counsel at that level, he will suffer an injustice which no postconviction remedy, including the right to trial de novo, can correct. This illustrates the soundness of the United States Supreme Court's ruling in *Callan v. Wilson*, 127 U.S. 540, 32 L. Ed. 223, 8 S. Ct. 1301 (1888), when it held that the right of trial by jury must be accorded in the court of original jurisdiction.

S. Ct. 1301; 1 Dillon's Municipal Corporations (4th ed.), 501, § 433; 3 McQuillin, Municipal Corporations (2d ed.), 605, § 1163.

It appears, therefore, that there is in existence a standard for determining what crimes are embraced within the Sixth Amendment protection at least insofar as it gives the right to trial by jury. It is true that the cases have discussed the difference between "petty offenses" and "serious crimes" only in connection with the right of trial by jury, and it is said that traditionally and at common law the petty offenses against municipal corporations could be punished without benefit of trial by jury, and no mention is made of the question whether, traditionally, the defendant had the right to appear by counsel. But the word "summarily" is used repeatedly in these discussions which we have quoted, and I think it reasonable to assume that if such offenses are so petty that they do not warrant the services of a jury for the protection of the defendant, they also do not require the services of an attorney.

It is evident, accordingly, that the offenses for which the right to counsel is not available must be confined to those which are indeed petty. Ordinarily it is the nature of the offense which is determinative, and not the severity of the penalty. But if the penalty imposed for a petty offense is too severe or if it does not "fit the crime," it may be necessary to provide counsel or the validity of the penalty may be successfully attacked. If the majority fears that a rule such as this will cause confusion in the courts of limited jurisdiction, the answer is that such confusion can be avoided if the municipal legislative body makes certain that its ordinances defining petty offenses do not include serious offenses and that excessive punishments are not prescribed.

The majority complains that the municipal courts are already inundated with cases of drunkenness and other minor offenses. However deplorable the condition may be, I fail to see how it can be alleviated simply by denying counsel to persons charged with more serious offenses.

As the cases I have cited have pointed out, one criterion for determining whether an offense is petty in nature is its

relation to the criminal law of the state: If the offense is made a crime by statute, the fact that it is punished as a petty offense by a municipality does not make it any the less serious. The opprobrium which follows conviction may well be just as great. This is another consideration, whether it is malum prohibitum or malum in se. Another factor to consider is whether the offense was deemed petty and was punished summarily at common law. Using these criteria, it should not be too difficult for the municipal court to determine, in any given case, whether the offenses charged are sufficiently serious to warrant appointment of counsel for the indigent defendant.

Having arrived at this conclusion, I am confronted with the realization that we have two recent cases which are not in harmony with my view. The alleged offense in *George v. Day,* 69 Wn.2d 836, 420 P.2d 677 (1966), and also in *Seattle v. Rohrer,* 69 Wn.2d 852, 420 P.2d 687 (1966), was drunken driving. Drunken driving is defined as a gross misdemeanor by RCW 9.91.020. The seriousness of this offense, while it was not discussed, was nevertheless a factor in this court's decision in *Tacoma v. Heater,* 67 Wn.2d 733, 409 P.2d 867 (1966), holding that the defendant had been denied his constitutional right to counsel. Yet, in the two cases just cited, the same offense was held to be petty because the penalty did not exceed 6 months in jail and a fine of $500.

Insofar as they hold that drunken driving is a petty offense, I would overrule them and hold that the respondent, having been charged with offenses of larceny and contributing to the delinquency of a minor (which are crimes under the statutes of this state and carry with them a serious onus, being malum in se), was denied a right guaranteed by the sixth amendment to the United States Constitution and article 1, section 22 (amendment 10) of the Washington Constitution, when his request for appointment of counsel was refused.

The appellant complains that the trial court granted the respondent's motion to dismiss an appeal to the superior court, which he had perfected, and allowed him to proceed by way of writ of review. The writ of review was, of

course, the only way in which the respondent could obtain a determination of the question of his right to counsel in municipal court.

The appellant cites no authority for the proposition that the procedure followed by the respondent was improper. It does not claim that it was prejudiced in any way by the fact of the dismissal of the appeal. I see no merit in this contention.

In regard to the suggestion that the municipal judge had no authority to appoint counsel, I adopt the statement of the superior court judge who said, "Any court which has the power to try a defendant who is charged with a serious crime, has the inherent power to try him in conformity with constitutional standards, and this includes the power to appoint counsel for an indigent defendant."

I would affirm the judgment.

HILL and HAMILTON, JJ.—We concur in much but not all of the dissent. We certainly concur in the last line, "I would affirm the judgment."

FINLEY, J. (dissenting)—I concur substantially in Justice Rosellini's dissent; nevertheless, I feel compelled to present an alternative analysis as to certain facets of that dissent. In addition, I feel some critical comment is relevant and must be presented as to the background or foundation of certain assumptions and conclusions embraced in the majority by Hale, J.

With some literary license, it may be said that the majority's disposition of this appeal is painted in bright and spritely colors with broad and dazzling brush strokes. The result is scintillating. At first blush, it is almost spectacular. But even spectaculars in the creative arts can change hues and lose lustre on close examination. I am not disturbed by the color and vigor of Justice Hale's opinion. I am concerned by skips and misses on the canvas—skips and misses not masked by striking colors and dubious apocalyptic visions of chaos in the administration of justice in Washington.

In contrast, the dissent by Justice Rosellini does not rely upon shock value. Its formulation rests on solid ground—namely, the ideals and objectives of our state and federal constitutions, rationally interpreted and applied in the context of our crowded, complex, modern industrial and urban society. I find no shaky premises in the dissent, no irreparable flaws in design or in results. I do disagree with certain aspects of its focus. Frankly, I believe it relies too heavily on anachronistic legal concepts. There is a real danger that the factors proposed by the dissent for limiting the right to counsel would place emphasis upon the accidents of legal history rather than upon the realities of existing society.

Before turning to the reasons which lead me to have certain reservations as to the factors which Justice Rosellini has isolated and emphasized in regard to appointment of counsel, I think it essential to stress two points with regard to Justice Hale's majority opinion. That opinion first takes a national estimate of need for publicly provided counsel, inflates it by including all traffic offenses, and points to the resulting caseload with something akin to horror. Secondly, the opinion samples the Seattle City Code's criminal ordinances to establish the proposition that there is little relationship between the seriousness of the offense and the maximum sentence prescribed by ordinance.

I believe that the majority opinion ignores available statistics. It needlessly discounts the creative ability of municipal officers to inaugurate appropriate redesigning of municipal ordinances.

Readily available statistics place the need for publicly provided counsel at trial in misdemeanor cases in King County, excluding those traffic offenses for which imprisonment is rarely imposed and public drunkenness prosecutions, at 10,562 cases per year.[12] The number in the municipal courts of Seattle, with which this case is directly concerned, is 6,219 cases per year.[13] Use of sanctions other than

---

[12] *See* National Legal Aid and Defender Association, How to Organize a Defender Office 39-51, at 48 (1967).

[13] *Ibid.*

imprisonment against those unable to pay traffic fines would reduce the total in Seattle municipal courts to 4,505 cases per year.[14] The above figures represent cases in which a substantial probability of loss of liberty presently exists.[15] The effect of revision of the present scheme of penalties to create special maximum sentences for repeated offenses and recognition of aggravated degrees of existing offenses is speculative. However, this could produce some further reduction of the above figures. In short, the actual need for publicly provided counsel falls considerably short of the picture painted by Justice Hale, and an attempt to meet that need is unlikely to cause the collapse of our legal system.

Given the existing punishments, equated with a requirement for publicly provided counsel, it is apparent that our municipalities would be faced with a burden in the latter respect greater than that suggested by the above figures, particularly as to traffic offenses. Several suggestions have been made as to appropriate means of reducing that burden.[16] It has been suggested that consideration be given to the actual probability of imprisonment on a case-by-case basis in defining the right to publicly provided counsel. It has also been suggested that the probability of imprisonment be considered as to each offense, without attention to the circumstances of the particular defendant. Finally, the suggestion has been made that the solution lies in a legislative revision of authorized imprisonments to conform with actual existing sentencing practices.

"Substantial probability of imprisonment" is not a desirable standard for application on a case-by-case basis by individual judges.[17] If the same standard is applied on an

[14]*Ibid.*

[15]Defined by the study as a 5 per cent chance of any imprisonment. *Id.,* at 40-41; Junker, *The Right to Counsel in Misdemeanor Cases,* 43 Wash. L. Rev. 685, 711 n. 137 (1968). *But see* notes 23 and 24, *infra,* discussing the possibility that short periods of imprisonment may be constitutionally permissible without the provision of counsel.

[16]*See* Junker, *supra* note 4 at 703-15.

[17]*Cf. Betts v. Brady,* 316 U.S. 455, 86 L. Ed. 1595, 62 S. Ct. 1252 (1942) *overruled by Gideon v. Wainwright,* 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792, 93 A.L.R.2d 733 (1963).

offense-by-offense basis, two problems arise. First, aggravated or repeated offenders are denied counsel, even though they may receive the maximum punishment instead of the usual punishment. Second, application of an offense-by-offense standard amounts to an assertion that courts have a privilege to suspend enacted law by customary sentencing practices.[18] While courts may in some cases have the power to act in this manner, sound judicial discretion restrains its use. A far more sound solution is to redraft municipal codes to remove or reduce punishments which are never imposed, and to provide separate charges and punishments for aggravated offenses. In many cases, this revision would amount to no more than drafting existing sentencing practices into the written law.[19]

Justice Hale has adequately described the present crazy-quilt confusing pattern regarding authorized maximum punishments for ordinance offenses. These ordinances have simply accumulated over time. An attempt to legislatively define the appropriate relationship between the maximum punishments authorized is overdue. However, the legislative task of balancing the cost of providing counsel against the authorized punishments is not beyond the competence of responsible officials. They need do no more than reduce below the level of a substantial deprivation of liberty the maximum sentence for offenses which they consider to be minor. If such offenses are not the source of significant opprobrium, provision of counsel for their trial would not be required.

It is a judicial question under the constitution of this state and the constitution of the United States whether or not counsel is constitutionally required at the trial of an offense for which a given quantum of imprisonment is assessed, or conviction of which generates significant social

---

[18]*See* note 33 *infra*.

[19]*See* National Legal Aid and Defender Association, *supra* at 40-43. In addition to changes which merely bring the written law into conformity with present practice in sentencing, it is open to the responsible legislative bodies to reduce the substantive penalty for certain offenses, and thereby negate any counsel requirement resulting from the penalty alone. *See* text *infra*.

opprobrium. In the course of confusing judicial with legislative questions by treatment of the cost of providing counsel, the majority opinion has usurped the legislative function, has denied the responsibility of this court concerning the constitutions of this state and the United States, and has queried the competence of duly elected municipal officials to carry out their duties in accord with the constitutional guidelines established by this court and the Supreme Court of the United States.

Justice Rosellini has delineated the novel application of rules of constitutional interpretation by the majority which has resulted in the aforementioned topsy-turvy approach to the constitutional issue posed in the instant case, and he has carefully and correctly resolved that issue. My disagreement with his dissent is not with the result or nature of his reasoning as to the right to publicly provided counsel, but rather with the factors which he has developed to test the further implementation of that right. Affirmance of the trial court in providing counsel in this case *has the potential* to impose significant burdens on the administration of the courts of limited jurisdiction. Unquestionably, to alleviate these burdens, immediate action from local legislative bodies would be required. It is imperative that guidelines for those bodies be articulated clearly and with reference to actual social realities and objectives involved.

As I read Justice Rosellini's opinion, he considers three factors important in concluding that counsel need be provided. Those factors are: (1) is the offense denounced in the state criminal code; (2) is the offense malum in se; and (3) is the offense one which was not punishable summarily at common law. Affirmative responses to these factors favor the right to counsel; negative responses to these factors indicate that counsel is not constitutionally required. The court must weigh the factors appropriately and determine if counsel must be provided.

Justice Rosellini uses the term "petty offense." The term, taken from the context of federal cases discussing the right

to jury trial under the Sixth Amendment, is of little utility in terms of the right to publicly provided counsel.[20]

The term has acquired a special significance in relation to very different policy considerations relating specifically to jury trial. That is not our problem in the instant case;[21] the

[20]Analytically, the instant case requires us to consider the operation of the Fourteenth Amendment upon the Sixth Amendment. The guarantee of counsel in all criminal prosecutions is therefore qualified by a threshold determination that the right to counsel in a particular class of prosecutions is a fundamental right. See *Gideon v. Wainwright, supra* at 340-41. The balancing process which establishes that a right is fundamental will balance different interests as to each right enumerated in the Sixth Amendment. The balancing process as to jury trial is not the same as that as to the right to publicly provided counsel. See Junker, *supra* at 704-07.

*Duncan v. Louisiana,* 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444 (1968) simply established that jury trial for certain offenses was a fundamental right. It in no way supports a statement that the Sixth Amendment rights to jury trial and publicly provided counsel are coextensive *as applied to the states by the Fourteenth Amendment.* A grammatical approach to constitutional construction in this area has been discredited since *Powell v. Alabama,* 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55 (1932). For reasons sufficiently apparent from that case, I believe that the provision of our state constitution relating to the right to counsel should receive a construction dictated by current policy considerations as well as syntax.

[21]In *Duncan v. Louisiana, supra,* note 20, the Supreme Court held the jury trial guarantee applicable to the states. *Bloom v. Illinois,* 391 U.S. 194, 20 L. Ed. 2d 522, 88 S. Ct. 1477 (1968), held a 24-month state commitment for criminal contempt violative of the jury trial guarantee, continuing an identification between criminal contempts and crimes made in *Cheff v. Schnackenberg,* 384 U.S. 373, 16 L. Ed. 2d 629, 86 S. Ct. 1523, 1537 (1966). In *Cheff,* four justices, including Justice Fortas, acceded to the opinion by Justice Clark which contained the proposition that a commitment for criminal contempt for less than 6 months need not require jury trial. (The court has treated contempt as an offense for which the opprobrium is negligible.) That proposition was buttressed by reliance upon 18 U.S.C. § 1. Its converse, that longer commitments require jury trial, was laid down as an exercise of the supervisory power of the Supreme Court over the federal courts. 384 U.S. at 380. As a result, the 6-month rule is not binding on the states. *Dictum* in *Duncan* approving application of the 6-month rule to the states is not joined by a majority of the court. See Justice Fortas' concurrence, 391 U.S. at 211.

In light of the above state of judicial confusion, reliance upon the jury trial cases and the 6-month rule appears to me to be extremely dubious. For this court to transfer the confused rationale of the above

right to jury trial and to publicly provided counsel are of importance to different classes of defendants for significantly different reasons. *See* Junker, *supra* note 4 at 704-08. Justice Rosellini has used the term "petty offense" solely for the purpose of *labelling the result* reached by weighing the three factors to which I have referred. Clarity of analysis would be enhanced by dispensing with the term. It suffices to say that there is a class of offenses to which the right to publicly provided counsel does not attach on constitutional grounds.[22]

After careful consideration of the factors which Justice Rosellini has proposed to ascertain the class of offenses to which the right to publicly provided counsel attaches, I disagree with his analysis in the following significant respects. The relationship between the three factors which he isolates and the severity of the penalty assessed for the offense is nowhere elaborated and clarified, although that relationship is of major importance.[23]

I would agree with Justice Rosellini that an ordinance which purports to punish an offense (1) denounced in the state criminal code, (2) classifiable as malum in se, and (3)

---

cases to a new area without close attention to the interests involved would compound confusion.

[22]After a suitable accumulation of precedent, "criminal prosecutions" (as that term is used in the state constitution and is used in the Sixth Amendment and is made applicable to the states by the Fourteenth Amendment) can be defined by reference to the accumulated precedent regarding the right to publicly provided counsel. A similar definition can be made by reference to accumulated precedent with regard to the right to jury trial. If those definitions are essentially the same, it will *then* be time to equate them for reasons of doctrinal simplicity.

In the meantime, this court can only confuse the law by inadvertently importing with the analogy to jury trial policy considerations born in the federal judicial system and governed by different administrative, fiscal, and other considerations.

[23]It is clear for example that imprisonment for a period of 10 days may be imposed by a *state* without jury trial, if the offense is "nonpetty" for reasons other than the sentence. *Dyke v. Taylor Implement Mfg. Co.,* 391 U.S. 216, 20 L. Ed. 2d 538, 88 S. Ct. 1472 (1968). Whether a 10-day confinement would be permissible when counsel, rather than jury trial, had been denied, raises issues referred to at note 20, *supra* and interests discussed at note 34, *infra*.

not punishable summarily at common law describes an offense to which the constitutional right to counsel should attach. The opprobrium attendant upon conviction of such an offense may be as significant as a major deprivation of liberty. Moreover, on a descriptive basis, Justice Rosellini's analysis would be generally accurate for I believe that an experienced trial judge would unconsciously weigh the factors suggested by Justice Rosellini to arrive at the appropriate solution in the majority of cases. However, in terms of guidance to legislative bodies and a conscious articulation of the governing issues and values, the dissent has significant shortcomings.

I turn now to the specific factors proposed by Justice Rosellini. His first factor refers to the state criminal code. It will favor a grant of counsel in the case of felonies charged as misdemeanors by prosecutors appropriately using the device of a charge of disorderly conduct or a more specific ordinance violation. It will also favor a grant of counsel in the case of public welfare offenses serious enough to have been the subject of state legislation.[24]

His second factor, *viz.*, is the offense malum in se, incorporates an extremely confused body of law.[25] It directs at-

---

[24]Reference to the state criminal code could be a source of confusion with regard to public welfare offenses. The imposition of strict or vicarious criminal liability commits great discretion to the prosecuting official. One may reasonably expect that certain offenses punishable regardless of the mens rea involved may be dealt with by prosecutorial discretion exercised on the basis of the factual mens rea, the intent of the statute, and whether or not repeated offenses are involved.

If substantial differences exist between the enforcement policy and the statutory penalty, prosecution *under an ordinance* modeled on the statute but exacting a penalty which does not of itself entail a right to counsel should not require that counsel be provided. The state may desire to retain severe penalties and provide counsel for offenses as to which municipalities desire to take a contrary course.

This court should not construct a rule which prevents recognition of the factual difference in seriousness between those offenses prosecuted under state law and those prosecuted under local ordinances, so long as the maximum penalty under the ordinance does not substantially deprive the defendant of liberty and conviction does not carry with it substantial opprobrium.

[25]*See* R. Perkins, Criminal Law 11-12, 692-710 (1957). As an example of the difficulties raised by this excursion into antiquity, is the

tention to proper matters, but it does so in the wrong manner. It would favor a grant of counsel for most felonies charged as misdemeanors, and for lesser degrees of the more traditional crimes.[26] Under the classic interpretation, it would deny counsel for narcotics offenses, in spite of the social seriousness of these offenses and the severe penalties provided by law.[27]

The third factor seems to me totally misleading. If the offense was unknown at common law, this factor is of no help.[28] If the offense was known at common law, the reasons

---

offense denounced in Seattle City Code § 12.11.175 malum in se? The ordinance forbids owners, managers, or operators of public places where alcoholic beverages are sold, served, or consumed from knowingly permitting or causing therein a "topless" or "bottomless" a go-go performance. Regardless of our own or Victorian standards of morality, or the general power of common law judges to punish the corruption of public morals, the inquiry is essentially spurious.

The difficulties involved in attempting to apply the malum in se/malum prohibitum dichotomy to *existing law* are exemplified in Perkins, *The Civil Offense*, 100 U. Pa. L. Rev. 832 (1952). Ought we conclude that appointment of counsel on a charge of violation of Seattle City Code § 17.04.030 (possession of narcotics) turns upon the existence of a comparable state criminal provision, in spite of the absence of both other factors? Of what import are the present (RCW 69.33.410) (felony) and proposed (gross misdemeanor) state punishment provisions? At common law all felonies were malum in se.

It would be far more useful to inquire into the mens rea required for conviction, and then ask if doing the forbidden act with the requisite intent would lead to a substantial loss of reputation. This dispenses with a spurious historical inquiry, and focuses on the real issue. *Cf.* W. Prosser, Torts § 107 at 773-74 (3d ed. 1964) discussing "major social disgrace" with relation to slander *per se*.

[26]*E.g.*, assault in the third degree, RCW 9.11.030; petty larceny, RCW 9.54.090. Whether it would favor a right to counsel as to such offenses as lewdness, RCW 9.79.120, or indecent liberties, RCW 9.79.080, disregarding for the moment the penalty provisions, is not entirely clear. *See* G. Williams, Criminal Law §§ 69, 83, 189-90 (1961); R. Perkins, *supra* note 25, at 698 n.31 and text accompanying.

[27]RCW 69.33.410; Seattle City Code §§ 17.04.110, 17.08.060, 17.12.030.

[28]Most public welfare offenses can only be considered as known at common law by application of analogy—which is not favored as to criminal statutes. As a result, statutory offenses found to be unknown at common law will be modern mala prohibita. The factor is somewhat duplicative of the second factor when applied but denies counsel for reasons which are wholly fortuitous as to a large class of offenses.

why it was punishable summarily are in many cases only of antiquarian concern.[29] In some cases, those reasons may express social policies which are utterly at variance with our own or are unenforceable for constitutional reasons.[30] Obviously we do not live in Tudor or Stuart England. Just as obviously this court should concern itself with present day realities. If an offense is to be declared punishable without a right to counsel, that decision should be justified on existing social conditions—not on the peculiarities of Tudor or Stuart society.

The language of the state and federal constitutions speaks of criminal prosecutions.[31] The provisions with which we are concerned are enumerations of individual rights in such prosecutions. It appears to me that these provisions are designed to safeguard what such prosecutions jeopardize—liberty and reputation—and that a decision as to what is or is not a criminal prosecution for the purposes of these safeguards ought to turn upon a significant deprivation of liberty or injury to reputation.[32]

Such an analysis would first direct itself to the punish-

---

[29]As in the cases of the following summary offenses: preaching, dissenting religion without having taken the oath of allegiance, advancement of fond fanatical or false prophesy to the disturbance of the realm, unmarried motherhood, and destruction of bent grass. *See* Frankfurter and Corcoran, *Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury,* 39 Harv. L. Rev. 917, 932 (1926). The common law statutes concerned date respectively from Charles I, Elizabeth I, James I, and George II.

[30]Vagrancy and the like were punishable summarily in both England and colonial America. *See* Frankfurter and Corcoran, *supra* note 29. These offenses are notorious for their vagueness and the wide discretion vested in the enforcing officer. *See* Comment, *Constitutional Attacks on Vagrancy Laws,* 20 Stanford L. Rev. 782 (1968); W. LaFave, Arrest 87-88, 354-55 (1965); Sherry, *Vagrants, Rogues and Vagabonds—Old Concepts in Need of Revision,* 48 Calif. L. Rev. 557 (1960).

[31]U.S. Const. amend. 6: "In all criminal prosecutions, the accused shall enjoy the right to . . . have the assistance of counsel for his defense."

Const. art. 1, § 22: "In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel, . . ."

[32]*See Cheff v. Schnackenberg, supra* note 21 (Douglas, J., dissenting).

ment which maybe imposed upon conviction—the authorized maximum sentence. This clearly measures the threat of a direct and substantial deprivation of liberty.[33] In the event that the punishment authorized does not involve a substantial deprivation of liberty,[34] the mens rea requisite for conviction should be considered to ascertain if adverse social consequences attach to a determination that the accused possesses that state of mind.[35] If such adverse conse-

---

[33]Use of an actual threat of imprisonment standard on a case-by-case basis by individual judges is obviously inappropriate. *Cf. Betts v. Brady, supra* note 17. Use of a standard based on customary sentencing practices on an offense-by-offense basis usurps the legislative decision as to the appropriate maximum punishment. If legislative bodies desire that certain offenses be punished in a certain manner, the constitutional consequence, *viz.,* right to publicly provided counsel, must be faced. Judicial discretion in sentencing survives at the pleasure of the legislature which could create mandatory sentences for all offenses. It would be an abuse of that discretion to create a customary sentencing practice which was contrary to legislatively specified sentences for the purpose of evading constitutional issues.

Worse yet, an offense-by-offense standard would deny counsel to some offenders upon whom substantial imprisonment would in fact be imposed.

[34]*Dyke v. Taylor Implement Mfg. Co.,* 391 U.S. 216, 20 L. Ed. 2d 538, 88 S. Ct. 1472 (1968) (7-2) held that for jury trial purposes a sentence of 10 days in jail and a fine of $50 imposed in state court was punishment of a petty offense. In *dictum* the court appears to consider a 6-month commitment as similarly "petty." In this regard it should be recalled that both this case and *Cheff v. Schnackenberg, supra* note 21, dealt with criminal contempt.

As confinement for a period of over 10 days is certain to produce adverse results with an employer and disturbance of familial relations, I am inclined to believe that on a realistic basis such a confinement represents the point at which a substantial deprivation of liberty clearly begins. There may well be grounds for holding, as would the dissenters in *Dyke, supra,* that the beginning point is with some lesser quantum of imprisonment. *See* ABA Project on Minimum Standards for Criminal Justice, *Providing Defense Services* § 4.1 (Tent. Draft 1967) *and comment thereto,* arguing for appointment in "all criminal proceedings for offenses punishable by *loss of liberty,* except those types of offenses for which such punishment is not likely to be imposed." (Italics mine.) The comment makes it quite clear that the exception relates to a classification by offenses, not on a case-by-case approach. While I find such a classification eminently reasonable, I believe that the questions raised in the course of making it are in essence legislative. *See* note 33, note 19 and accompanying text, and note 24, *supra.*

[35]*E.g.,* the mens rea of larceny.

quences do not attach,[36] the actus reus should be considered, to ascertain if a determination that the accused did the forbidden act carries with it adverse social consequences.[37]

Such a realistic view of what a criminal prosecution entails should not subject this court to a charge of usurpation of power.

It must be admitted that recognition of a right to counsel in these cases will involve expense. That expense could be borne by members of the bar individually or as an association, or be provided for by appropriate legislative bodies. Justice Hale has dwelt upon the expense involved as making the issue before us one for the legislature. I must agree that the manner in which *compensation* is to be provided is for the legislature; but whether counsel is to be publicly provided under the constitution is unequivocally a question for the judicial branch of government.[38] Justice Rosellini

---

[36]*E.g.,* the "mens rea," or, more properly speaking, absence thereof, associated with conviction for violation of the third offense comprised within the three-fold prohibition of RCW 46.61.520 (negligent homicide by operation of vehicle with disregard for safety of others), *viz.,* objective criminal negligence. *See State v. Eike,* 72 Wn.2d 760, 435 P.2d 680 (1967) *and my dissent thereto.*

Other examples can be easily found among crimes of strict and vicarious liability, of which the food and drug acts are the most obvious.

[37]Usually social opprobrium derives from the mens rea of the crime —from general or specific criminal intent. But some public welfare offenses are so overwhelming in their impact as to create public outrage, regardless of the defendant's state of mind. As examples, consider the thalidomide scandal and the Morinaga milk scandal. (Described in Niibori and Cosway, *Products Liability in Sales Transactions,* 42 Wash. L. Rev. 483, 487-89 (1967).) The circumstances that such defendants are usually not indigent and are usually prosecuted in courts of general jurisdiction for offenses bearing serious penalties should not blind us to an analogous situation occurring with indigents for offenses bearing lesser punishments.

[38]In this regard, the legislature does not labor under the same confusion which appears to have baffled Justice Hale. RCW 10.01.110 *was amended* in the 1965 session by adding the following:

Provided, That this section shall also apply to such other proceedings and at such other time as may be constitutionally required.

Laws of 1965, ch. 133, § 1.

The amendment would at first blush appear to do no more than

has detailed the precedential considerations which require that the decision below be affirmed. I am in accord with his interpretation of the constitutionally required decision. Because the result dictated by the constitution would require the judges of courts of limited jurisdiction to confront a novel and complex problem, I have attempted to isolate relevant guidelines for their consideration. I do not mean by the extended critique of the factors discussed by Justice Rosellini to express in any way disagreement with that portion of his opinion which establishes the constitutional reasons upon which the decision below must be affirmed. Apart from what appears to me an unnecessary identification of "petty offenses" for jury trial purposes with the class of offenses in which the provision of counsel is not constitutionally required, I am fully in accord with his reasoning as to the source of the right to publicly provided counsel.[39]

In summary, the right to publicly provided counsel in this case arises from the circumstance that the defendant was faced with a substantial deprivation of liberty upon conviction. A threat of significant social opprobrium resulting from conviction would have also caused the right to arise. The doctrinal source of the right is the operation of the Fourteenth Amendment, which secures against state interference those liberties mentioned in the Bill of Rights

anticipate the result of *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), which was then on certiorari before the United States Supreme Court. However, it should also be recalled that *Tacoma v. Heater,* 67 Wn.2d 733, 409 P.2d 867 (1966) was before this court on appeal; and that the reach of the decision in *Gideon* was a matter of speculation. *See* Junker, *supra* note 4 at 690-91.

' In these circumstances, the legislature clearly deferred to this court's constitutional authority in granting an open-ended authority to appoint counsel in, at the very least, *all* stages of a felony proceeding, *and provided for their compensation.*

[39]As to the doctrinal considerations which dictate that the federal precedent as to the "petty offense" concept does not presently bind this court, and the policy considerations which weigh against according that precedent persuasive effect in delimiting the reach of the instant right, see notes 20, 21, and 22, *supra.*

which are fundamental rights. The balancing of interests which determines if a right appearing in the Bill of Rights is a fundamental right, protected from state interference, is a judicial function under the constitution. In my judgment, it is a function which ought never to be masked by misleading analogies. I have specified at length the results of application to existing law of the analogy drawn by Justice Rosellini, which I consider misleading in some respects. The weakness of the analogy as to the scope of the right— the "petty offense" concept—has nothing whatever to do with the rest of Justice Rosellini's argument. That argument balanced the interests and appropriately analyzed the legal basis of the right to publicly provided counsel. As a result, the greater part of this concurrence has been confined to analysis of weaknesses in the factors for limiting the right to publicly provided counsel proposed by Justice Rosellini, to discussion of an alternative analysis to limit the scope of the right, and to an attempt to point out that the majority has misplaced its emphasis upon cost.

The defense of ordered liberty begins with sensitive and rational implementation of the text of the constitution. A democracy cannot place a price tag on criminal justice, for to do so abandons the letter and spirit of American constitutional government. We ought to remember that civil disorder feeds upon injustice. We ought not forget that early in the history of Anglo-American culture it was necessary to establish by armed rebellion that "to none will we sell, to none will we deny or delay, right or justice."[40]

The implementation of that ringing pronouncement of the difference between a just society and rule by a self-interested fraction of society is less than perfect in our own time. *See* Report of the Commission on the Causes and Prevention of Civil Disorder, *Race and Violence in Washington State* 51 (1969). As judges we have the opportunity, the power, and the constitutional responsibility for appropriate decision making.

---

[40]"*Nulli vendemus, nulli negabimus, aut differemus rectum aut justiciam.*" Magna Carta.

The significant decision of the court below is long overdue. It should be affirmed.